**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **CAMPUS BOOK COMPANY, INC.;** | § | |
| **BJJ CORPORATION; CBSKY, INC.;** | § | |
| **CBSNM, INC.; and** | § | |
| **RENTTEXT.COM, INC.** | § | |
| | § | |
| **each individually and as representatives** | § | |
| **of all others similarly situated,** | § | |
| | § | |
| *Plaintiffs,* | § | **CASE NO. _____** |
| | § | |
| **v.** | § | |
| | § | **CLASS ACTION COMPLAINT** |
| **MCGRAW-HILL GLOBAL** | § | |
| **EDUCATION HOLDINGS, LLC;** | § | |
| **PEARSON EDUCATION, INC.; ,** | § | **DEMAND FOR JURY TRIAL** |
| **CENGAGE LEARNING, INC.;** | § | |
| **BARNES & NOBLE EDUCATION,** | § | |
| **INC.; BARNES & NOBLE COLLEGE** | § | |
| **BOOKSELLERS, LLC; FOLLETT** | § | |
| **HIGHER EDUCATION GROUP,** | § | |
| **INC.; and EDUCATIONAL** | § | |
| **PUBLISHERS ENFORCEMENT** | § | |
| **GROUP,** | § | |
| | § | |
| *Defendants.* | § | |

Plaintiffs Campus Book Company, Inc., BJJ Corporation, CBSKY, Inc., CBSNM, Inc., and Renttext.com, Inc. (collectively, the "**Plaintiff Retailers**"), who on their own behalf and on behalf of others similarly situated (the "**Independent Collegiate Retailers**") file this Class Action Complaint against defendants Cengage Learning, Inc., McGraw-Hill Global Education Holdings, LLC, and Pearson Education, Inc. (collectively, the "**Publishers**"), Barnes & Noble Education, Inc., Barnes & Noble College Booksellers, LLC (collectively, "**Barnes & Noble**"), and Follett Higher Education Group, Inc. ("**Follett**") (Barnes & Noble and Follett are collectively referred to herein as the "**Defendant Retailers**"), and Educational Publishers Enforcement Group ("**EPEG**"

or the "**Trade Association**") (the Publishers, the Defendant Retailers, and EPEG are collectively referred to herein as the "**Defendants**"), and respectfully allege the following:

## I.  NATURE OF THE ACTION AND SUMMARY OF THE ALLEGATIONS

1.  This antitrust case is about the Publishers and the Defendant Retailers lining their pockets at the expense of financially-vulnerable college students and the Plaintiff Retailers.  And, what's more, the Publishers and the Defendant Retailers eliminated from the marketplace those who could prevent them from doing so, including the Plaintiff Retailers and other Independent Collegiate Retailers like them.  Amidst trends of market-shifting and revenue decline in the higher education course materials industry, the Publishers and the Defendant Retailers conspired to protect their historical price increases and stranglehold on the market.  The Publishers collectively devised and agreed on a plan to force upon the market a product that *must be purchased anew* from the Publishers *by every single college student every single semester* and those purchases can be made only from the Defendant Retailers, thereby eliminating all substitute products and retail competitors, including the significant secondary market for course materials.  The product at issue is ironically called "Inclusive Access" ("**Inclusive Access**" or "**Inclusive Access Materials**").  In reality, it should be called "Exclusive Access" as there is nothing inclusive about it.  Designed by collusion and agreement, the product specifically *limits* access to higher education course materials and is exclusive to the conspiracy's members, resulting in the elimination of competition, the elimination of access to materials, universities, and students, and higher prices, among other anticompetitive effects.

2.  This case challenges the Defendants' conspiracy and their improper acquisition and use of monopoly power to irreparably harm the higher education course materials market by eliminating competition and thereby eliminating any consumer choice.  They disguised their anti-

competitive actions as technological advancements, but that was not their true purpose or effect. The Defendants' anticompetitive behavior has and will continue to destroy any competitive market for course materials in higher education.  The Defendants' anticompetitive behavior harms the entire market—it results in a complete lack of choice for students, exponentially higher prices for students, and reduction in quality and variety of products and services offered to students.  It further has stifled innovation in the marketplace and eliminated and otherwise harmed through improper means the Defendants' competitors and any secondary product markets, including those of the Plaintiff Retailers and other Independent Collegiate Retailers.

3.     The long-running conspiracy between and among the Defendants intends to and does artificially limit capacity and reduce supply, eliminate access, and eliminate secondary markets and competitors in the market for course materials at colleges and universities.  The conspiracy's end goal and result is eliminating competitors and raising prices.  The Defendants have accomplished the conspiracy through agreements in restraint of trade, concerted refusals to deal and group boycotts, exclusive dealing, targeted misinformation and coercion campaigns, and other exclusionary and anticompetitive conduct.  The Defendants also have separately and collectively acquired, enhanced, and maintained monopoly power through exclusionary and other anticompetitive conduct.

4.     The Defendants' illegal actions have and will ultimately result in a total monopoly and foreclosure of the market for the sale of course materials at every college and university, as well as the complete elimination of any competition for the sale of course materials.  Under the Defendants' currently-enacted plan, each semester, every student enrolled at each college or university must purchase course materials in a single format—Inclusive Access—from a single source—the Defendant Retailers—dictated by a single group—the Publishers (or, for colleges or

universities without a Defendant Retailer, by the Publishers themselves or at another exclusive publisher partner as dictated by the Publisher). The Defendants' plan eliminates consumer (student) choice for course material type or place of purchase at any college or university. And for these forced Inclusive Access course materials, prices will rise while quality, service, and innovation will decline, unchecked by any competitive market forces.

\*       \*       \*

5.      The Plaintiff Retailers and members of the Class are retailers who sell and rent course materials to students at independent collegiate retail stores located around colleges and universities (the "**Universities**") throughout the United States and also online. The Plaintiff Retailers' and the Class members' success and profitability depend on their ability to compete fairly for student purchases of course materials, which also helps ensure that students receive the lowest, most competitive prices and terms in the marketplace.

6.      Higher education course materials consist of traditional printed textbooks and other materials, as well as digital textbooks and e-textbooks, which have been used as an alternative to traditional, hard copy materials. Students historically obtain e-textbooks by purchasing access codes (or unique serial numbers) that are used to unlock digital textbooks that sometimes also include homework, assignments, quizzes, tests, and/or other learning software online (collectively, these higher education course materials are referred to as "**Course Materials**").

7.      The Publishers manufacture and sell and/or rent Course Materials and control at least 80%, and reportedly closer to 90%, of the market nationwide. They have been the dominant firms in the market for the last 30 years. The Association of American Publishers estimates the new Course Materials market in the United States is over $3 billion. The market for Course Materials is captive; although students are the Course Materials' end consumers, the Universities

(and their faculty) select which Course Materials the students must purchase.  Thus, the Publishers market Course Materials to the Universities, not their students, and the Publishers generally do not market the Course Materials on price or other aspects important to students.  In a properly functioning market, the Publishers would compete with each other to publish Course Materials for each University's classes and that competition would include the type, content, quality, service, and price of Course Materials.

8.      The Publishers have always made available for sale and sold Course Materials to both Defendant Retailers and Plaintiff Retailers.  The Defendant Retailers contract with the Universities for an "on-campus" location that sells and rents Course Materials.  The Plaintiff Retailers and Independent Collegiate Retailers, which include both brick-and-mortar locations as well as online sellers and platforms, compete with the Defendant Retailers to sell and rent Course Materials to students (including bids to become the "on-campus" location).

9.      For Universities that lease or subcontract their collegiate retail operations (rather than having them run by the institution itself), each such University has one lease-operated collegiate retailer, who has generally paid the University for the right to operate the on-campus store.  The Defendant Retailers operate over 50% of the on-campus stores nationwide, and they normally compete with each other to operate each University's on-campus store.

10.     Historically, the higher education Course Materials market included full and open competition between retailers.  Universities and faculty members selected Course Materials; publishers made available and sold such Course Materials to *all* retailers at the same price; and the students searched for competitive pricing and terms on those Course Materials—ultimately making purchases either from the Defendant Retailers (or, if not lease-operated, the institution's own on-campus store) or from the Plaintiff Retailers or other Independent Collegiate Retailers (in physical

locations and online).  Competition between retailers acted as at least some check on the captive Course Materials market—multiple opportunities existed for students to seek lower prices and preferred sales terms, such as on Amazon or Chegg.  For a majority of students, the Plaintiff Retailers were a much-needed source of more affordable or accessible Course Materials.

11.     The Plaintiff Retailers are sophisticated retailers of Course Materials capable of offering the same technology, platform, and delivery of Course Materials as the Defendant Retailers.  The Plaintiff Retailers have participated in the Course Materials market for over 20 years, during which time they served as at least some check on exorbitant Course Materials prices and relentless Course Materials price increases by offering lower-cost alternatives in formats and delivery methods to fit student demands.  The Plaintiff Retailers' participation benefited consumers and competition through price competition, personalized service, and innovative programs, such as offering rentals and robust e-commerce solutions.  Throughout their decades of operation, the Plaintiff Retailers have grown with and adapted their business to the market, including as e-textbooks and other digital offerings became available.  The Plaintiff Retailers were some of the first sellers on Amazon's Marketplace, a significant amount of their sales are online, and they have developed proprietary digital tools that enable them to thrive in the new technological environments.

*      *      *

12.     As the sale of Course Materials (over the Internet, by Amazon, and through rentals) increased competition and finally began lowering the price and increasing the availability of Course Materials, the Publishers looked for ways to reduce or eliminate competition and increase their revenues.  As an example, the Publishers moved to custom packaging and/or custom delivery of Course Materials with one-time digital access codes, "custom books" (i.e., offering the same

book with minimal alterations as an entirely new product), or other offerings that created a unique International Standard Book Number ("**ISBN**") and hindered or made it impossible to acquire the Course Materials in a used or second-hand format.  But even for these "new" Course Materials without a secondary market, the Plaintiff Retailers remained a much needed source of more affordable Course Materials for many students.  Because the Plaintiff Retailers could still obtain access to the Course Materials from the Publishers at the same cost as other retailers, they adapted and continued offering lower prices, preferred sales terms, or rental selections, remaining competitive and maintaining choices for students in the Course Materials market.

13.     This competitive market changed with Inclusive Access (sometimes also referred to as "Direct Access" or "Direct Bill").  For Inclusive Access, students are not purchasing any physical course materials and there is no choice of format or delivery method.  Instead, students are automatically enrolled in time-limited access (usually one semester) to the Publishers' online resources which can be "turned on" for the student's account only directly by the Defendant Retailers.

14.     For Inclusive Access, the Publishers contractually deliver Course Materials *only* through the Defendant Retailers (or, if not lease-operated, the institution's own on-campus store) by using either (a) a combination of exclusive dealing arrangements between the Defendant Retailers and the Universities and so-called license agreements (that operate as exclusive dealing arrangements) between the Publishers, the Universities, and the Defendant Retailers, or (b) a combination of exclusive dealing arrangements between the Defendant Retailers and the Universities and, upon information and belief, master exclusivity agreements between the Defendant Retailers and the Publishers.  The Publishers refuse to sell any Inclusive Access Materials to any other retailers, including the Plaintiff Retailers and the Class members, which is

also an agreed change in the terms and conditions of sale of Course Materials and Inclusive Access Materials.  This agreement in restraint of trade and concerted refusal to deal and group boycott of the Independent Collegiate Retailers as to Inclusive Access Materials was agreed upon by the Publishers and also encouraged and agreed upon by the Defendant Retailers who compete with the Independent Collegiate Retailers.

15.     Contrary to representations by the Publishers and the Defendant Retailers to justify or defend their anticompetitive actions, Inclusive Access Materials do not represent innovation or any technological advancement.  The Inclusive Access Materials provide students with exactly the same Course Materials the Publishers were selling before and that were available in multiple formats from multiple retailers across the globe competing on price and other student considerations.  The Defendants have merely added an access limitation element that eliminates competition in the market.  Instead of selling students (through any retailer) the access code or unique serial number to access the product, the Publishers and the Defendant Retailers have coordinated, conspired, and agreed that the students will be granted access to Inclusive Access Materials solely through the Defendant Retailers.  Thus, Inclusive Access is an artificial construct no different from the digital access codes or "custom books" described above, except that the Publishers and the Defendant Retailers have coordinated, conspired, and agreed to prevent acquisition of Inclusive Access Materials by anyone except the Publishers and the Defendant Retailers—often through direct billing or automatic deductions from a student's account with the University—thereby eliminating all student choice and price and term competition in the market.

16.     It has been stated that there is a way for students to "opt out" of Inclusive Access.  But the Publishers and the Defendant Retailers have purposefully blocked the "opt out" process

**CLASS ACTION COMPLAINT**                                                                                   **PAGE 8**

by failing to provide or enable any such process and engaging in disinformation or confusion campaigns.  In reality and as a practical matter, there is either no way or no meaningful way to "opt out" of Inclusive Access once it has been designated the material for a class.  Upon enrollment in a class that is subject to Inclusive Access and these exclusive dealing arrangements, the students are automatically subscribed to Inclusive Access Materials and charged for those materials by the Defendant Retailers.  The "opt out" process, when there is one at all, is opaque, confusing, and difficult if not impossible to execute.  Students, including those who have specifically inquired about the "opt-out" options, receive misinformation, primarily from the Defendant Retailers, regarding the ability to opt-out, whether the Inclusive Access Materials differ from other materials available, and how and what they are being charged for the Inclusive Access Materials.  For example, students have been told there is no opt-out available, that they cannot take a class or will be de-enrolled from a class if they opt out and seek substitute materials, or that substitute materials available from other retailers like the Plaintiff Retailers are not sufficient or not allowed.  The procedures students must follow are difficult or impossible to discover, navigate, or follow.  Therefore, even in cases where the Plaintiff Retailers have been able to obtain and sell Course Materials, such as access codes or e-textbooks, that provided the same substantive material as the Inclusive Access Materials (albeit with a different ISBN assigned by the Publishers, and for which the Publishers purposefully charge a higher price than they have set for the same Inclusive Access Materials), they are still unable to compete because students are practically unable to opt-out.  This inability of students to opt-out is a purposeful result of the Publishers' and the Defendant Retailers' behavior intended to capture 100% of the market.

17.     If anything, Inclusive Access Materials are a step backwards in innovation and service to the consumer students.  As noted by the Scholarly Publishing and Academic Resources

Coalition in their published opposition to a proposed merger between two Publishers—Cengage and McGraw-Hill—digital subscriptions like Inclusive Access offer inferior quality and variety to the status quo.  Examples of these inferiorities include requiring that all students access materials in the same way at the same price; applying expiration dates to access that prevent materials from being retained for future reference, shared with others, or resold; quality that depends substantially on access to technology and internet connections; technical issues requiring class time to explain or address; ignoring student preferences for some print material over exclusively digital; and studies showing digital formats may not be better for students.  Inclusive Access Materials also are not usually a better deal for students, even prior to the upward price effects that will result from the elimination of the competitive market for Course Materials.  To the extent that they appear to be a better deal in any instance, the "better deal" is an artificial image created by the Publishers, who have complete control over pricing for both the Inclusive Access Materials and the potential substitute Course Materials.

18.     The exclusive dealing agreements effectuating the conspiracy, concerted refusal to deal, group boycott, and anticompetitive monopolistic behavior have similar, and in some instances, the same language, as well as the same terms and conditions.  Upon information and belief, the master exclusivity agreements between the Publishers and the Defendant Retailers extend the same type of exclusivity as the combination of the exclusive dealing agreements and so-called license agreements.  The Plaintiff Retailers have discussed with the Publishers the ability to purchase the Inclusive Access materials from each of them, and each has refused while supplying the same pre-textual explanations, including that Inclusive Access Materials do not and cannot exist in a format available for sale to the Plaintiff Retailers, blaming the Universities and the Defendant Retailers.

19.     The exclusive dealing arrangements foreclose a substantial portion of the Course Materials market, due to the approximately 90% of the Course Materials market controlled by the Publishers and the over 50% of the lease-operated retail stores nationwide controlled by the Defendant Retailers.  Further, as to each University served by the Publishers and the Defendant Retailers, 100% of the Inclusive Access Materials market is foreclosed.  Because students are required to purchase the Inclusive Access Materials and the Defendants have limited that access to themselves, there is no other opportunity for the student-consumers to purchase the Inclusive Access Materials elsewhere, either from the Plaintiff Retailers or anyone else.  There is no alternative distribution channel for the Plaintiff Retailers (or anyone else) to obtain or sell the Inclusive Access Materials.  And there is no meaningful alternative distribution channel for the Plaintiff Retailers (or anyone else) to sell other Course Materials that could substitute for the Inclusive Access Materials.

20.     Inclusive Access is an unprecedented change in both the product and the access offered by the Publishers for Course Materials, and this change was implemented at nearly identically the same time by multiple competing Publishers who had ample opportunities to, and did, conspire and collude on this issue.  The Publishers have each ramped up their efforts to convert all Universities with which they are associated to primarily use Inclusive Access Materials, or at least to primarily use Inclusive Access Materials for the core and lower-level classes that have the highest student enrollment, and therefore have the largest economic impact on both the Publishers and the Defendant Retailers.  Defendants seek to convert every class they can to Inclusive Access.  Many of the exclusive dealing arrangements have annual quotas that guarantee additional classes and student enrollment each year required to use solely Inclusive Access Materials—e.g., in year

three of some arrangements, 10,000-plus students at a single University are forced into Inclusive Access.

21.      Inclusive Access has not arisen from consumer demand, innovation, or other proper economic and competitive incentives.  As described above and herein, Inclusive Access is the opposite of innovation and not what students want or need.  Instead, the idea and implementation of Inclusive Access arose from the Defendants' conspiracy and improper use of monopoly power. The Publishers collectively devised and agreed on a plan to force upon the market a product that *must be purchased anew* from the Publishers *by every single student every single semester*, thereby eliminating all substitute products, including the significant secondary market for Course Materials.

22.      Among other ways, the Defendants have used the trade association EPEG to conspire and implement their anticompetitive behavior.  EPEG was formed in 2016, and all the Publishers are members.  EPEG was formed ostensibly to engage in anti-counterfeiting efforts, but it has provided the Publishers with the opportunity, means, and motive to conspire, and has implemented standards designed to reduce supply and access, limit consumer choice, and raise prices of Course Materials.  The Publishers and the Defendant Retailers also had the opportunity to conspire at events for the National Association of Collegiate Stores, during coordinated activities in relation to rule-making for the Higher Education Opportunity Act, during coordinated pilot programs of Inclusive Access, and during merger discussions between at least McGraw-Hill and Cengage.

23.      The Publishers and the Defendant Retailers then collectively devised and agreed on a plan whereby the Defendant Retailers would assist the Publishers with the implementation of their collusive scheme and, in return, would be made the exclusive source of the Publishers'

Inclusive Access product, thereby eliminating all substitute sources (including the Independent Collegiate Retailers and the significant online market) and any potential competition on price, terms, or other benefits to the student-consumers.  In instances where any related materials are available to other retailers, the Publishers and the Defendant Retailers collectively agreed that the Defendant Retailers would receive favorable terms and conditions including price.

24.     The Publishers acknowledge that Course Materials have become so expensive that some students simply cannot afford them.  However, the Publishers are to blame for the fact that Course Materials costs have significantly outpaced inflation; according to industry publications, Course Materials costs have risen 184% since 1998 and more than 1,000% since the 1970s.  The Publishers and the Defendant Retailers claim (and have in some cases convinced the Universities) that Inclusive Access will make Course Materials more affordable for all.  But in fact, Inclusive Access has and will continue to raise prices and limit supply and access.  The Defendants are actually implementing a collusive scheme to maintain their stranglehold on the industry while disguising it as reform.  If the Defendants are not stopped soon, there will be no players left in the industry to reverse the damage they have caused.

*       *       *

25.     The Publishers win with Inclusive Access because they secure 100% of the business of "new" Course Materials each semester from each converted course, resulting in more frequent, guaranteed purchases as well as increased prices.  With all the Publishers pushing Inclusive Access and not offering competing products (that are actually better quality, better value, and more desirable and effective for student-consumers and University faculty), there will soon be no substitute to which the Universities can switch.  In a coordinated manner, the Defendants have instituted a stranglehold on Course Materials with Inclusive Access.

**CLASS ACTION COMPLAINT**                                                                          **PAGE 13**

26.     Although it should not and has not mattered to the Publishers—under normal economic conditions and motives—who sells their Course Materials to students, the Defendant Retailers also win with Inclusive Access.  Because the Publishers have agreed to sell Inclusive Access at each University <u>only</u> to and through the Defendant Retailers, the Defendant Retailers now automatically receive 100% of sell-through to consumers on any course that is subject to Inclusive Access, in most cases through direct or automatic charges.  Historically, the Defendant Retailers received approximately 35% or less sell-through per course due to competition from Plaintiff Retailers and the Class members.

27.     The losers in the Inclusive Access equation are the student-consumers and the Plaintiff Retailers and Class members.  The students are deprived of all choice and competition on price, terms, quality, and innovation.  They are now given a take-it-or-leave-it product at a take-it-or-leave-it price, and in many instances, "leave it" does not mean choosing not to have the Course Materials—it means being de-enrolled and unable to take a class due to Defendants' misinformation and coercion campaigns, and the elimination of any meaningful opportunity to "opt out" of Inclusive Access.  The Plaintiff Retailers and the Class members also suffer severely as a result of the Defendants' illegal actions, as they cannot compete where the Publishers (the creator of the content, itself) will not sell them the Inclusive Access Materials and the Defendants block student opt-outs.

28.     As shown below in detail, the Defendants have taken the following illegal and anticompetitive actions:

    a.  The Publishers entered into horizontal conspiracies to unreasonably restrain trade by raising prices, artificially limiting capacity and reducing supply, eliminating necessary access including through exclusive dealing

arrangements, using trade associations to set pre-textual standards, and implementing concerted refusals to deal with and group boycotts of the Plaintiff Retailers and Class members;

b.  The Defendant Retailers entered into horizontal conspiracies to unreasonably restrain trade by raising prices, artificially limiting capacity and reducing supply, and eliminating necessary access including through exclusive dealing arrangements;

c.  The Publishers and the Defendant Retailers entered into a hub-and-spoke conspiracy to unreasonably restrain trade by raising prices, artificially limiting capacity and reducing supply, eliminating necessary access including through exclusive dealing arrangements, and concerted refusals to deal with and group boycotts of the Plaintiff Retailers and Class members;

d.  The Publishers and the Defendant Retailers have acquired, enhanced, and maintained monopoly power through exclusionary conduct and other anticompetitive conduct, including combining, conspiring, or attempting to monopolize the market for Course Materials at Universities; and

e.  The Publishers and the Defendant Retailers unfairly and deceptively restrained competition in the market for Course Materials at Universities.

29.  The Plaintiff Retailers and the Class members seek a finding that the Defendants' actions violate federal and state antitrust and/or unfair competition laws; a permanent injunction preventing the Defendants from continuing their illegal conduct and rectifying ongoing anticompetitive effects caused by their illegal conduct; and damages on behalf of the Plaintiff Retailers and the Class members.

## II.  PARTIES

**A.  The Plaintiff Retailers**

30.     Named Plaintiff (and Putative Class Representative) Campus Book Company, Inc. is a New Mexico corporation, and may be served with pleadings and process in this proceeding through the undersigned counsel.  Campus Book Company, Inc. operates or operated Independent Collegiate Retailers serving students at University of Texas Arlington, University of New Mexico, and online.

31.     Named Plaintiff (and Putative Class Representative) BJJ Corporation is an Arkansas corporation, and may be served with pleadings and process in this proceeding through the undersigned counsel.  BJJ Corporation operates or operated Independent Collegiate Retailers serving students at Middle Tennessee State University, Nashville State Community College, University of Houston, and Volunteer State Community College and online.

32.     Named Plaintiff (and Putative Class Representative) CBSKY, Inc. is a Kentucky corporation, and may be served with pleadings and process in this proceeding through the undersigned counsel.  CBSKY, Inc. operates an Independent Collegiate Retailer serving students at Eastern Kentucky University and online.

33.     Named Plaintiff (and Putative Class Representative) CBSNM, Inc. is a New Mexico corporation, and may be served with pleadings and process in this proceeding through the undersigned counsel.  CBSNM, Inc. operates Independent Collegiate Retailers serving students at Dona Ana Community College and New Mexico State University and online.

34.     Named Plaintiff (and Putative Class Representative) Renttext.com, Inc. is a Texas corporation, and may be served with pleadings and process in this proceeding through the undersigned counsel.  Renttext.com sells Course Materials online.

**B.     Defendants**

35.     Whenever this Complaint alleges that a Defendant has engaged in an act, deed, or transaction, the allegation means that the Defendant engaged in the act, deed, or transaction by or through the authorization, order, direction, and/or action of its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the Defendant's business or affairs.   Various persons, firms, and corporations, who are known or unknown to Plaintiffs, and not named as defendants in this action, including senior executives of Defendants, have participated as co-conspirators in the violations alleged herein and have performed and made statements in furtherance of the conspiracy in violation of the laws asserted herein.

36.     The Defendants participated in and profited from their and their co-conspirators' efforts to eliminate and restrain competition in the Course Materials market by raising prices, artificially limiting capacity and reducing supply, eliminating necessary access including through exclusive dealing arrangements, using trade associations to set pre-textual standards, concerted refusals to deal with and group boycotts of the Plaintiff Retailers and Class members, and eliminating secondary markets and competitors.   The Publishers have furthered the conspiracy by and through, among other things, concerted refusals to deal and group boycotts and acquiring, enhancing, and maintaining monopoly power through exclusionary conduct and other anticompetitive conduct.

37.     Defendants engaged in interstate commerce through the purchase and sale of Course Materials and Inclusive Access Materials and conducting business in this State.

### 1.  *The Publishers*

#### a.  <u>Cengage</u>

38.     Defendant Cengage Learning, Inc. ("**<u>Cengage</u>**") is a Delaware Corporation with its offices and principal place of business located in Boston, Massachusetts and may be served with summons pursuant to Federal Rule of Civil Procedure 4 through its registered agent The Prentice Hall Corporation at 251 Little Falls Drive, Wilmington, Delaware 19808, or pursuant to the Federal Rules of Civil Procedure wherever it may be found.

39.     From January 1, 2015 through present (the "**<u>Class Period</u>**"), Cengage was a Publisher that participated in the Course Materials market and sold Inclusive Access in the United States.

40.     Cengage is a member of EPEG.

#### b.  <u>McGraw-Hill</u>

41.     Defendant McGraw-Hill Global Education Holdings, LLC ("**<u>McGraw-Hill</u>**") is a Delaware Limited Liability Company with its offices and principal place of business located in New York, New York and may be served with summons pursuant to Federal Rule of Civil Procedure 4 through its registered agent Cogency Global, Inc. at 850 New Burton Road, Suite 201, Dover, Delaware 19904, or pursuant to the Federal Rules of Civil Procedure wherever it may be found.

42.     During the Class Period, McGraw-Hill was a Publisher that participated in the Course Materials market and sold Inclusive Access in the United States.

43.     McGraw-Hill is a member of EPEG.

### c. **Pearson**

44.     Defendant Pearson Education, Inc. ("**Pearson**") is a Delaware Corporation with its offices and principal place of business located in Upper Saddle River, New Jersey and may be served with summons pursuant to Federal Rule of Civil Procedure 4 through its registered agent The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801, or pursuant to the Federal Rules of Civil Procedure wherever it may be found.

45.     During the Class Period, Pearson was a Publisher that participated in the Course Materials market and sold Inclusive Access in the United States.

46.     Pearson is a member of EPEG.

### 2.  *The Defendant Retailers*

### a. **Barnes & Noble**

47.     Defendant Barnes & Noble College Booksellers, LLC is a Delaware Limited Liability Company with its offices and principal place of business located in Basking Ridge, New Jersey and may be served with summons pursuant to Federal Rule of Civil Procedure 4 through its registered agent Capitol Services, Inc. at 1675 S. State Street, Suite B, Dover, Delaware 19901, or pursuant to the Federal Rules of Civil Procedure wherever it may be found.  Barnes & Noble Education, Inc. is the parent company of Barnes & Noble College Booksellers, LLC and is a Delaware Corporation with its offices and principal place of business located in Basking Ridge, New Jersey and may be served with summons pursuant to Federal Rule of Civil Procedure 4 through its registered agent Capitol Services, Inc. at 1675 S. State Street, Suite B, Dover, Delaware 19901, or pursuant to the Federal Rules of Civil Procedure wherever it may be found.

48.     During the Class Period, Barnes & Noble was a Defendant Retailer that participated in the Course Materials market and sold Inclusive Access in the United States.

### b. **Follett**

49.     Defendant Follett Higher Education Group, Inc. is an Illinois Corporation with its offices and principal place of business located in Westchester, Illinois and may be served with summons pursuant to Federal Rule of Civil Procedure 4 through its registered agent The Corporation Trust Company, Corporation Trust Center, 1290 Orange Street, Wilmington, Delaware 19801, or pursuant to the Federal Rules of Civil Procedure wherever it may be found.

50.     During the Class Period, Follett was a Defendant Retailer that participated in the Course Materials market and sold Inclusive Access in the United States.

51.     Defendant Follett purposefully availed itself of the Delaware forum through its contacts with the forum by operating on-campus bookstores in Delaware and participating in the sale and distribution of Inclusive Access in Delaware as part of the conspiracy with the Delaware-organized Defendants, causing injury to class members in Delaware and giving rise to this suit.

### *3. The Trade Association/EPEG*

52.     Defendant Educational Publishers Enforcement Group is a consortium of the Publishers and may be served with summons pursuant to Federal Rule of Civil Procedure 4 through its members, the Publishers.

53.     During the Class Period, the Publishers formed EPEG, which has provided the Publishers with the opportunity, means, and motive to conspire.  EPEG also has developed, adopted, and implemented so-called Anti-Counterfeit Best Practices (the "**EPEG Guidelines**"), which the Publishers claim are for the purpose of eliminating counterfeit textbooks in the marketplace, but actually are pre-textual standards designed to allow the Publishers to control who can buy and sell Course Materials and further the conspiracy's goals to raise prices, reduce supply and access, limit consumer choice, and raise prices of Course Materials.  The Publishers in

combination (1) coerce retailers to adopt and follow the EPEG Guidelines, and (2) enforce the EPEG Guidelines.

### III.   JURISDICTION AND VENUE

54.     The Plaintiff Retailers bring this action pursuant to Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), Section 16 of the Clayton Act (15 U.S.C. § 26), and Section 2 of the Robinson-Patman Act (15 U.S.C. §§ 13(a) and (f)) for damages, including a request for treble damages and reasonable attorneys' fees and costs of this litigation.  The Plaintiff Retailers also bring this action pursuant to various state antitrust and consumer protection laws set forth herein, and the common law of unjust enrichment for damages, and, where available by law, punitive damages, and reasonable attorneys' fees and costs of this litigation.  The Plaintiff Retailers also request injunctive relief pursuant to the Clayton Act (15 U.S.C. § 26).

55.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

56.     All claims under federal and state law are based upon a common nucleus of operative facts, and the entire action commenced by this Complaint constitutes a single case that would ordinarily be tried in one judicial proceeding.

57.     This Court has supplemental subject matter jurisdiction over the pendant state antitrust and consumer protection law claims under 28 U.S.C. § 1367.

58.     The Court also has jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) because (a) there are more than 100 members of the Class; (b) citizenship of at least one proposed Class member is different from that of any Defendant; and (c) the matter in controversy, after aggregating the claims of the proposed Class members, exceeds $5,000,000, exclusive of interest and costs.

59.     Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15, 22, and 26 and 28 U.S.C. §§ 1391(b) and (c) because, during the Class Period, one or more of the Defendants resided, transacted business, was found, or had agents in this district.

60.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant:   (a) operates its principal place of business or is incorporated in this District; (b) transacted business throughout the United States, including in this District; (c) participated in the sale and distribution of Inclusive Access throughout the United States, including in this District; (d) had substantial contacts with the United States, including in this District; and/or (e) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.   Specifically, Defendants Barnes & Noble, Cengage, McGraw-Hill, and Pearson are all organized in Delaware.   Although Defendant Follett is not a Delaware corporation, it has purposefully availed itself of the Delaware forum through its contacts with the forum by operating on-campus bookstores in Delaware and participating in the sale and distribution of Inclusive Access in Delaware as part of the conspiracy with the Delaware-organized Defendants, causing injury to class members in Delaware and giving rise to this suit.   Further jurisdictional contacts are alleged herein.

## IV.    FACTS

61.     The Plaintiff Retailers incorporate by reference, as if fully set forth herein, the allegations contained in the Nature of this Action and Summary of the Allegations of this Complaint.

A.      **Course Materials Industry**

62.     Higher education course materials consist of traditional printed textbooks and other materials, as well as digital textbooks and e-textbooks, which have been used as an alternative to traditional, hard copy materials.  Students obtain e-textbooks by purchasing access codes (or unique serial numbers) that are used to unlock digital textbooks.  E-textbooks generally are available in multiple formats to address multiple users' needs.  In addition, some e-textbooks or access codes also provide the student with access to homework, assignments, quizzes, tests, and/or other learning software online.  The size of the market for new Course Materials is estimated at over $3 billion by the Association of American Publishers.

63.     There also is a secondary market for used Course Materials.  Students who purchased Course Materials in the hard copy format have the option to re-sell those Course Materials, including to retailers.  Those used Course Materials are then sold by the retailers to other students, at reduced prices compared to the same Course Materials in new format.  Around 2008, Course Materials became widely available for rent, also contributing to the secondary market.  With Course Materials rental, the student would pay a lower price to rent the Course Materials until approximately the end of a semester.  Then, the student would return the Course Materials to the retailer, where the Course Materials could be rented again or sold.

64.     Course Materials are identified and described in the market by an assigned ISBN, a unique, numeric book identifier.  Retailers (generally direct purchasers of the Course Materials from the publishers) and consumers (generally students) use the ISBN to locate the Course Materials for purchase or sale.  Particularly since the early 2000s, when the sale of Course Materials online became more prevalent, students began using ISBNs to find Course Materials and locate the most competitive pricing.  Publishers purchase ISBNs from an

affiliate of the International ISBN Agency and assign them to Course Materials.  Historically, a new ISBN is only assigned to each separate edition of a publication.  Thus, if a publication with a certain ISBN was previously released (i.e., is not a brand new publication), it can be identified and purchased, sold, or rented on the secondary market, without requiring a new purchase from a Publisher.

65.     Course Materials are produced and sold by publishers.  The Publishers produce Course Materials that they sell to retailers, among others.  The Publishers are competitors of each other.  The Publishers, who have been dominant firms in the market for the last 30 years, are the three largest Course Materials publishers and together make up over 80% (and reportedly closer to 90%) of the Course Materials market.[1]  Further, in May 2019, Cengage and McGraw-Hill announced their intent to join forces in an all-stock merger, which would merge the second- and third-largest publishers into a single giant with near-majority share of the market.[2]

66.     The Plaintiff Retailers and the Class members are retailers of Course Materials.  The Plaintiff Retailers have been in the Course Materials market for over 20 years, and their operations include brick-and-mortar locations as well as online sellers and platforms.   The Plaintiff Retailers have been market leaders in providing lower-cost alternatives, formats and delivery methods to meet student demands, personalized service, and innovative programs such as rentals and e-commerce.

---

[1] Pearson reports that its higher education market share is approximately 40% over the last five years.  Cengage is the second largest college textbook publisher with approximately 24% of the higher education market.  McGraw-Hill is the third-largest college textbook publisher with approximately 21% of the higher education market.

[2] Multiple objections to this merger have been filed, including by industry groups and student groups.

67.     The Defendant Retailers are also retailers and are the two largest retailers in the Course Materials market.[3]   The Defendant Retailers contract with the Universities to have a location "on campus" that sells and rents Course Materials.   Unless the school runs its own bookstore,[4] each University has one lease-operated collegiate retailer, who has generally paid for the right to be the "on campus" bookstore.   In the past few years, the Defendant Retailers have significantly increased the amount they will pay to become the lease-operated collegiate retailer at a University, paying millions of dollars to secure just one "on campus" location.   The Defendant Retailers are given access to operate on the Universities' computer systems which allows them to take federal financial aid and payment directly from students' accounts for Course Materials sold through the Defendant Retailers.

68.     The Defendant Retailers are competitors of each other and competitors of the Plaintiff Retailers and the Class members.   Retailers are direct purchasers of Course Materials from publishers and are the largest customer group for the Publishers.   Historically, the Publishers have sold Course Materials at the same prices to all retailers, including the Plaintiff Retailers, Class members, and the Defendant Retailers.   Retailers are the primary Course Materials' distribution channel (through sale and rental) to the ultimate consumer – students.

69.     In the early days of higher education retail, there were only large retailers (including the Defendant Retailers) that were giant corporations operating physical locations with relatively captive student-consumers.   But as the industry developed, more retailers entered the market (including the Plaintiff Retailers) and students became savvier in shopping for Course Materials

---

[3] The Defendant Retailers control an estimated 57% of the lease-operated collegiate retailers at Universities and an estimated 64% of total student enrollment at Universities overall.

[4] In some instances, a school maintains and operates its own "on campus" bookstore, which is referred to an institution-owned bookstore.

as to both price and service.  Especially after the introduction of online selling—of which the Plaintiff Retailers were at the forefront—the Course Materials market offered many retailer choices for students (*e.g.*, the Plaintiff Retailers, the Defendant Retailers, Amazon, Chegg, and others) and those retailers competed on price and service.

70.     The market for Course Materials is captive.  Although the students are the ultimate consumers of the Course Materials, the Universities (and their faculty) are responsible for selecting which Course Materials students are required to purchase.  Thus, the Publishers market Course Materials to the Universities, not the students.  The Publishers are generally in competition with each other to be chosen as the publisher for Course Materials for classes at each University and would compete on type, content, quality, service, and price.

71.     The Publishers began their elimination of competition and the secondary market with the inclusion of terms for e-textbooks and similar digital Course Materials.  Pursuant to the Publishers' terms, consumers of e-textbooks and similar digital Course Materials cannot re-sell those particular Course Materials.  The Publishers created access codes that were "one-time-use" only.

72.     The Publishers also impeded the secondary market of hard copy materials through manipulation of the ISBN system.  The Publishers created so-called "custom packages" that were a campus-specific offering with a unique ISBN.  For example, the Publishers would place two existing materials with existing ISBNs into a "package" and give it an entirely new ISBN.  Or the custom package would include a disk with additional materials or sometimes even just a blank sheet of paper that was "new," and this would be a "package" with an entirely new ISBN.

73.     The Publishers also created so-called "custom books" when an existing material with an existing ISBN would have minimal alterations performed—such as a special title page or

elimination of a chapter(s)—and give it an entirely new ISBN.  Students would then be told to buy this new "custom" book, when they otherwise could have purchased the same book with additional chapters at a cheaper price.  The Publishers would often offer financial rewards to colleges, departments, or faculty for requiring and using a disposable custom book in class, all in an effort to drive sales higher.

74.     These "custom" books and packages hindered or made impossible the acquisition of the Course Materials in the secondary market—or even of competing new copies of materials with the prior ISBNs—because students could not identify the appropriate substitute materials through use of the ISBN, which of course was the Publishers' intent.  The Publishers ensured new sales while pitching these "custom" programs as a benefit to the schools and students.

75.     Retailers are the primary Course Materials' distribution channel to students.  Once the Course Materials are chosen and made known, the retailers would purchase the Course Materials for resale or rental—generally from the Publisher, but also from the secondary market where available.   Retailers purchase both physical Course Materials and digital Course Materials from the Publishers.  Retailers pay a wholesale price for the Course Materials, which is a discounted amount from the list price.  The retailer then sets its own price for re-sale of the Course Materials.

76.     The retail Course Materials business is all about service and meeting customer demands.  Student-consumers are told which Course Materials they have to purchase, and therefore the retailer must be able to provide those Course Materials in order to compete at all.  Further, many student-consumers are looking for a one-stop-shop and do not want to purchase from multiple retail locations—especially for physical retail locations.  The retailer must be able to provide all necessary Course Materials for all classes offered at the Universities in order to

effectively compete.  Therefore, when a retailer intends to compete either online or in a physical location at a particular University, access to the Course Materials products of the Publishers—who are providing 80-90% of the products the Universities require for the students—is key.

77.     The Plaintiff Retailers' and Class members' success and profitability depend on their ability to compete fairly for student purchases of Course Materials, which also helps ensure that students receive the most competitive prices and terms in the marketplace.  The Plaintiff Retailers and Class members have also been essential to development and operation of the secondary market, including through the purchase and sale of used Course Materials and renting Course Materials.  The secondary market acts as a market check, providing opportunities for students to seek lower prices and preferred sales terms.

78.     Prior to the unlawful conspiracies, exclusive dealing, and monopolization detailed herein, the Plaintiff Retailers have always had access to the Course Materials products of the Publishers, including the digital materials and custom materials.  The Publishers offered all of the Course Materials for sale to the Plaintiff Retailers and generally on the same price and terms as the Defendant Retailers.  Many Course Materials also were part of the secondary market.

79.     Also prior to the unlawful conspiracy, exclusive dealing, and monopolization detailed herein, the Defendant Retailers obtained Course Materials in the same manner as the Plaintiff Retailers—following the adoption of Course Materials by the Universities, the Defendant Retailers would purchase the Course Materials for resale or rental from the Publisher and the secondary market.  But now the Defendant Retailers are involved in pushing the Publishers' Inclusive Access products at the Universities where the Defendant Retailers are located—products that, once adopted, result in all or nearly 100% of the student-consumers being forced to purchase these products from the Defendant Retailers.

80.     Two major trade associations related to the Course Materials market play a role in the unlawful activities alleged herein.

81.     EPEG is a consortium of the Publishers that provided both opportunities for the Publishers to conspire and a method to restrain competition in the market.  The Publishers formed EPEG in 2016 and since that time have regularly coordinated and communicated, allegedly for activities related to EPEG, but on information and belief for a number of other purposes, including the conspiracies, exclusionary conduct, and monopolization alleged herein.  The stated purpose of EPEG was for the Publishers to collectively develop, implement, and enforce so-called Anti-Counterfeit Best Practices, the EPEG Guidelines, and through EPEG the Publishers did in fact collectively develop, implement, and enforce the EPEG Guidelines.  The stated goal of the EPEG Guidelines was to eliminate counterfeit textbooks in the marketplace.  In reality, the EPEG Guidelines were intended to and have the effect of the Publishers controlling who can buy and sell the products in the marketplace, and the Publishers have coercively used the EPEG Guidelines against the Plaintiff Retailers and Class members to reduce supply and access, limit consumer choice, and raise prices of Course Materials, as discussed further herein.

82.     The National Association of Collegiate Stores ("**NACS**") is a professional trade association that previously had membership of all retail outlets, including the Plaintiff Retailers and the Defendant Retailers.  The Publishers are non-voting members of NACS and attend NACS events, including panels for which the Publishers coordinate and present together.  In September 2018, NACS announced a change in its bylaws that would remove from its membership bookstores that are not the institutions' or student/faculty owned (*i.e.* not "on campus").  The changes were approved and implemented on April 1, 2019, which effectuated the removal of the Plaintiff Retailers and Class members from NACS.  This removal is harmful and furthers the unlawful

activities alleged because it deprives all competitors but the Defendant Retailers of the information shared at NACS events, the advocacy efforts of the NACS, and direct interaction with senior campus administrators and leaders through NACS.  The Defendant Retailers and the Publishers regularly coordinate and communicate allegedly for activities related to NACS, as well as communicating among themselves and with each other at NACS events.  NACS provided another opportunity for the Defendant Retailers to communicate and conspire.

83.     While the cost of other books has steadily decreased, the costs of higher education Course Materials has significantly risen over the last decade.[5]  A recent study reported that 90% of faculty at universities reported that textbook affordability is a concern for their institution.[6] When asked about the biggest drivers of high course material prices, faculty cited unnecessary new editions, bundled courseware, bookstore price gouging, one-time-use digital codes, and monopoly control of the textbook publishing industry.

84.     Due in large part to the secondary market and the competition at the retail level provided by the Plaintiff Retailers and Class members, average student spending has been dropping and the Defendants have all faced severely declining revenue.

85.     As discussed further below, the anticompetitive schemes undertaken by the Defendants in this case seek to destroy competition in the Course Materials market in order to (1) restore the Publishers to their prior position with a captive student-consumer audience who must always purchase new materials produced and sold by the Publishers; and (2) restore the Defendant Retailers to their prior position with a captive student-consumer audience who has no other retail choice.

---

[5] The Bureau of Labor Statistics reports that textbook costs increased 88% between 2006 and 2016.

[6] *See* FlatWorld Textbook Affordability Study (2019).

**B.**     **Inclusive Access**

86.     The result of the Defendants' anticompetitive schemes, Inclusive Access, was a so-called "new" and "better" product that is neither new nor better.  The scheme is just a re-hash of the "custom book" scam with a new twist—limited access and forced sales.  The Publishers—in coordination with the Defendant Retailers—use  artificial technological constructs and claims of "technological advancement" to claim that the same material previously offered through other Course Materials is an entirely separate product that can only be provided "new."  Further, the material now must be purchased every semester with only limited-use privileges and can only be obtained from the "on campus" bookstore (in most cases, operated by the Defendant Retailers).

87.     The Publishers have pushed the market to "Inclusive Access" products (sometimes also called "Direct Access" or "Direct Bill").  Each semester, the Publishers have exponentially increased the number of Universities and classes affected by Inclusive Access.  The Publishers also have indicated their plans to move all Universities and classes to 100% Inclusive Access-type materials.

88.      Inclusive Access is and will be widespread, impacting every University across the United States.

89.     For Inclusive Access, students are not purchasing actual Course Materials, and there is no choice of format or delivery method.  There is no longer any access code offered or unique serial number sold alone or in conjunction with physical or digital materials—although there could be; it is solely the result of the choice and design of the Publishers (in concert) that the delivery method and format are artificially restricted as described herein.

90.     So instead, students are provided time-limited access (usually one semester) to the Publishers' online resources, which can be "turned on" for the student's account only directly by

the Defendant Retailers.  Under Inclusive Access, any student enrolled in a participating class is required, usually through a so-called "course fee" automatically added to the student's tuition bill, to purchase the Inclusive Access Materials from a specific Publisher through the Defendant Retailer for that University.  Inclusive Access is typically offered through no other outlet.  Inclusive Access sometimes provides students with some type of software component, including homework or lab assignments, but in most cases, Inclusive Access simply provides the students with the same exact Course Materials they would receive in physical copy or digital format.  The Publishers have admitted that the content offered through Inclusive Access is the same content.  Thus, with Inclusive Access, students are receiving the same Course Materials content as before but have had (or will have) their costs increased, their quality decreased, and their choices eliminated—all for the privilege of turning in their homework.

91.     The product at issue is ironically called "Inclusive Access" when in fact it should be called "Exclusive Access"—it is a product designed by collusion and agreement among competitors with monopoly power specifically to *limit* access to Course Materials and make it exclusive to members of the conspiracy to sell and to make it exclusively the only product and delivery method that students can purchase.

92.     Each semester, every student enrolled at a University is forced to purchase course materials in this single format – Inclusive Access – from a single source – the Defendant Retailers, as dictated by the Publishers (or, for Universities without a Defendant Retailer, at another exclusive Publisher partner, as dictated by the Publisher).  The result of this exclusive access is to eliminate competitors (like the Plaintiff Retailers and Class members), the secondary market, and any student choice in the Course Materials market.

93.     This "Exclusive Access" is accomplished through a series of exclusive dealing arrangements between the Publishers, Defendant Retailers, and/or Universities—arrangements that are identical or strikingly similar amongst the Publishers and the Defendant Retailers.

94.     The Publishers contractually deliver Inclusive Access *only* through the Defendant Retailers (or, if not lease-operated, the institution's own on-campus store) by using either (a) a combination of exclusive dealing arrangements between the Defendant Retailers and the Universities and so-called license agreements (that operate as exclusive dealing arrangements) between the Publishers, the Universities, and the Defendant Retailers; or (b) a combination of exclusive dealing arrangements between the Defendant Retailers and the Universities, and, upon information and belief, master exclusivity agreements between the Defendant Retailers and the Publishers.

95.     In most cases, Inclusive Access begins with a pilot program impacting a few large introductory courses at a University and thereafter grows each semester to the largest courses impacting the greatest number of students and a significant portion of the Course Materials market. In year three of most arrangements, thousands of students are forced into Inclusive Access.  These exclusivity arrangements are discussed in further detail below.

96.     The Publishers have refused to sell Inclusive Access Materials to the Plaintiff Retailers and other Class members, including at:  the University of New Mexico, Eastern Kentucky University, New Mexico State University, Dona Ana Community College, and the University of Texas Arlington, and the University of North Texas in 2019.   The Plaintiff Retailers approached each of the Publishers regarding why they would not sell Inclusive Access Materials to them, and each of the Publishers responded with the same pre-textual explanations, including that it was due to exclusivity requirements with the Defendant Retailers (or school-operated on-campus stores)

either directly or through the Universities and that the Inclusive Access Materials do not or cannot

exist in a format available for sale to the Plaintiff Retailers.

97.     For example, when the Plaintiff Retailers attempted to purchased Inclusive Access

Materials from Defendant McGraw-Hill, the order was cancelled, and the Plaintiff Retailers were

notified by Defendant McGraw-Hill that "this is an inclusive access item and there are strict

contracts to follow.  Follett is the only vendor authorized to purchase these types of items for this

school."  In addition, when the Plaintiff Retailers attempted to purchase Inclusive Access Materials

from Defendant Pearson, the order was also cancelled, and the Plaintiff Retailers were notified that

there was a "contractual agreement exclusively with Barnes & Noble for the course fee materials."

98.     In very few instances, the Publishers have offered to sell the Plaintiff Retailers an

access code or similar product that is arguably a substitute for the Inclusive Access Materials.  But

the Publishers have not offered that product at the same cost as that product or the Inclusive Access

Materials are offered to the Defendant Retailers.  Moreover, the Publishers only did so after legal

intervention by the Plaintiff Retailers.  Further, as discussed below, the Publishers and the

Defendant Retailers also have taken other steps to block students from being able to "opt out" of

the direct and automatic charges for Inclusive Access Materials, such that students have no

opportunity to purchase, and Plaintiff Retailers have no opportunity to sell these so-called

substitute products.

99.     Contrary to representations by the Defendants, Inclusive Access Materials do not

represent any innovation, technological advancement, or cost savings to students.

100.    The Inclusive Access Materials only provide students with exactly the same

Course Materials available previously in multiple formats from multiple retailers.  The only

difference is a limitation on access, which does not add anything.  The access limitation actually

subtracts from the student's experience and rights for the materials—they now have *only* digital

materials available *only* in one specific format *only* for a very limited period of time.  The student

also can obtain the materials *only* through one retailer and payment method, which is often direct

billing or automatic deductions from a student's account with the University.  The access limitation

also subtracts from competition in the marketplace, as other retailers such as the Plaintiff Retailers

have no ability to obtain or sell the Inclusive Access Materials and there is no viable substitute.

101.    The Defendants cite to technology as the driver for the move to Inclusive Access,

but the development of the Inclusive Access Materials was not driven by the market or consumers.

102.    Consumer preference does not support Inclusive Access.  Studies and other

evidence show that students indicate a preference for a physical book as opposed to digital

materials.[7]

103.    Product features and quality do not support Inclusive Access.  Industry opinion is

that digital subscriptions offer inferior quality and inferior variety to the status quo of

Course Materials.  Examples of these inferiorities include requiring that all students access

materials in the same way at the same price; applying expiration dates to access that prevent

---

[7] *See* March 1, 2018 Study at University of Central Arkansas; *see also* Naomi S. Baron, *Word Onscreen: The Fate of Reading in a Digital World*; *see also* Barnes & Noble Q2 2020 Earnings Call for the period ending Sept. 30, 2019 (Dec. 4, 2019) (wherein CEO Mike Huseby stated, "While digital coursework delivery is increasing, evidence persists that there is still a strong appetite to learn using the physical book.  Our annual student pulse survey received response from more than 100,000 students.  96% of those students told us that they find print textbooks to be a helpful resource."); *see also* Letter from the Scholarly Publishing and Academic Resources Coalition ("SPARC"), to Honorable Makan Delrahim, Assistant Attorney General, United States Department of Justice Antitrust Division (Aug. 14, 2019) (concluding that "[a]bout half of students prefer some kind of print material over exclusively digital" and finding that "digital format may not, in fact, be better for students"); *see also* The Inclusive Access Model, Jason Lorgan, Director of UC Davis Stores, https://www.slideshare.net/bisg/jason-lorgans-presentation-20150318, (May 1, 2015) (surveying more than 5,000 students who participated in a pilot program of Inclusive Access by Cengage, McGraw-Hill, and Pearson where 55% of students preferred print over Inclusive Access).

materials from being retained for future reference, shared with others, or resold; and quality that depends substantially on access to technology and internet connections.

104.    Learning outcomes do not support Inclusive Access.  Studies and other evidence have shown that physical books are more effective for education than digital materials.[8]  So-called "first day readiness" also is not enhanced by Inclusive Access.  With prior Course Materials, over 80% of students already had all their class materials before the first or second day of class.  With Inclusive Access, technical orientation and other technical issues actually require class time to explain or address, which does not result in first-day readiness and also decreases class time spent on substantive matters and delays the onset of course study.  Further, a comparison at one University disproves the claim that Inclusive Access improves student engagement and grades—the majority of courses where adoption of Inclusive Access occurred experienced a decrease in the percent of students with a grade of "C" or better.[9]

105.    Affordability does not support Inclusive Access.  The Publishers have claimed to Universities that there is a lower cost in order to convince the Universities to adopt Inclusive Access.  For example, Defendant Pearson has claimed that with Inclusive Access "all students are paying a lower and equitable price," and the Defendant McGraw-Hill claims that Inclusive Access provides the "lower-cost option for individual courses, with prices of up to 70% off the cost of traditional bound textbooks."  These are misrepresentations by the Defendants to further their anticompetitive schemes.

---

[8] *See* 2017 Study by Patricia Alexander, literacy scholar at the University of Maryland, in *Review of Educational Research* (determining that if a person is reading something more than 500 words, that person's comprehension will likely take a hit if the person is using a digital device).

[9] *See* Tennessee Board of Regents, Comparison of Grade Distributions: Fall 2014 to Fall 2015.

106.    Inclusive Access Materials are not usually a better deal for students than the substantively-comparable Course Materials.  For example, a comparison of textbook course fees at Volunteer State Community College reveals that the lowest cost was offered by the Independent Collegiate Retailer and that the cost of Inclusive Access was significantly higher (often double or triple the cost):

| Volunteer State Community College | Business Law (Custom) for BUSN 2370 | Network + Guide to Networks (Custom) for CITC 1302 | Conceptual Physical Science (Custom) for PSCI 1030 |
|---|---|---|---|
| Inclusive Access | $79.70 | $70.35 | $87.50 |
| Amazon | $29.49 | $24.86 | $29.97 |
| Chegg | $29.49 | $23.99 | $30.99 |
| Plaintiff Retailer | $29.99 | $29.99 | $29.99 |

107.    To the extent that they appear to be a better deal in any instance, such appearance is an artificial image created by the Publishers, who have complete control over pricing for both the Inclusive Access Materials and the Course Materials.  When the Publishers have compared costs to show Universities, they use their own prices as the baseline rather than market pricing.  For example, in materials provided by a Publisher to a University the school reported the following:

| Class | Number | Book Title | Inclusive Access Pricing | New Book Pricing | New Book with Code Pricing | Used Book Pricing | Used Rental Pricing | Access Code Pricing | Inclusive Access Loose Leaf |
|---|---|---|---|---|---|---|---|---|---|
| BIOL | 11700 | Biology in Focus | $113.14 | $161.00 | $187.00 | $120.75 | $80.50 | $136.00 | *Included in Fee* |

The Publisher did not report the price at the Plaintiff Retailers or the Amazon price.  Amazon currently lists the textbook for rental at $34.96, used at $49.97, and in paperback new at $59.97.  The Plaintiff Retailers would have rented the textbook for the market price—$29.95.  Purportedly providing such information to the University in "case study" form misrepresents the price and cost savings.  Moreover, the "case study" does not provide the ISBN for the University to independently confirm the cost of the book.

108.     Further, there are other costs to be taken into consideration.  At least one University requested an increase in the student fees to cover the increased costs to the University associated with Inclusive Access.

109.     That the Inclusive Access Materials are not a better deal for students will only get worse due to the upward price effects that will result from the elimination of the competitive and secondary markets for Course Materials.

110.     As revealed by communications directly from Publishers, the driver and purpose of Inclusive Access was never to reduce costs or provide any other benefits to students. The sole driver and purpose was to eliminate competition.  For example, in February 2015, a Senior Consultant for Defendant Cengage communicated about a "course fee model" that the Defendant Retailers were "banking on" and stated that:

> "**The goal is to cut out online student shopping (aka Amazon) and guarantee 100% sell-through.**"

111.     In a recent interview of the CEO of Cengage, Michael Hansen, after the announcement of the McGraw-Hill and Cengage merger, agreed that as the Publishers capture additional volume through Inclusive Access they "are able to rid [themselves] of the used bookstore market."[10]

112.     A recent study confirmed that if the Publishers can destroy the secondary market, they may enjoy profits 42.6% higher than under current conditions.[11]

---

[10] *See* CNBC Interview of Michael E. Hansen, CEO of Defendant Cengage, and Nana Banerkee, President of Defendant McGraw-Hill (May 1, 2019).

[11] *See* Matt Schmitt and Tongtong Shi of Analysis Group, *Working Paper*, UCLA Anderson (2019).

113.    It has been stated—including by Defendants—that there is a way for students to "opt out" of Inclusive Access.  But in reality and as a practical matter, there is either no way or no meaningful way to opt out of Inclusive Access.

114.    Upon enrollment in a class that is subject to Inclusive Access and the exclusive dealing arrangements described above, the students are automatically subscribed to Inclusive Access Materials and charged for those materials by the Defendant Retailers.

115.    In many instances, there is no opt-out process at all.  Pursuant to the contractual arrangements and the direct enrollment/billing process, any opt-out process must be facilitated by the Defendants.  In many instances, the Defendants have purposefully failed to provide or enable any opt-out process.  For example, students have been told by Defendant Barnes & Noble there is no opt-out available for Inclusive Access materials at New Mexico State University:



Similarly, Course Information Descriptions at Nashville State refer to Inclusive Access as the "required text" and inform the student that "associated fees are automatically applied to [the student's] account."

116.    Even where there is a supposed opt-out process, it is opaque, confusing, and difficult if not impossible to execute.  The Defendants have purposefully made it so and have

implemented barriers to opting-out and deterred students from opting-out.  The procedures students must follow are difficult to discover, navigate, or follow.  For example, even when the fact of an opt-out is communicated to students, there is no option provided to students to opt-out at any time in the purchasing or direct bill process.  For example, Defendant Barnes & Noble included the following for the below course at Northwest Arkansas Community College:



While providing no viable opportunity to opt-out, Defendant Barnes & Noble charges $104.95 for a product that was on Amazon for rental for $23.  In addition, the language referencing the opt-out often emphasizes that materials are not obtainable elsewhere—saying, for example, "please be aware that in some cases, opting out will make passing your course impossible," or requiring the student to say, for example, "I want to opt out of access to all required materials for this course." Further, opt-out procedures are often presented only on a University-wide basis and not a class-by-class basis, designed to further discourage students from even attempting to opt out.

117.  In most cases, the opt-out requires the student to go through the Defendant Retailers, such as going through a Defendant Retailer online portal or having to go in-person to the Defendant Retailer location.  And the Defendant Retailers in particular have engaged in disinformation and coercion campaigns to discourage or prevent students from "opting out."  The misrepresentations have included whether the Inclusive Access Materials differ in content from other materials available, how students are being charged for the Inclusive Access Materials, what

students are being charged for the Inclusive Access Materials, and the consequences of a student choosing not to purchase the Inclusive Access Materials from the Defendant Retailers.  For example, students and Universities have been told by the Publishers and the Defendant Retailers that substitute materials available from other retailers such as the Plaintiff Retailers are not sufficient or not allowed.  Students also have been told that they cannot take a class or will be de-enrolled from a class if they do not purchase the Inclusive Access Materials.

118.    Further, in most cases there is no alternative means to purchase Inclusive Access or any substitute Course Materials, so the opt-out procedure is meaningless even if technically provided.

119.    Even in the very cases where the Plaintiff Retailers have been able to obtain and sell Course Materials, such as access codes or e-textbooks, that provided the same substantive content as the Inclusive Access Materials, they are still unable to compete because students are practically unable to opt-out.  Further, these substitute materials have been assigned a different IBSN by the Publishers, and the Publishers purposefully charge a higher price than that set for the same content just called Inclusive Access, which further prevents competition.

120.    The requirement for students to purchase Inclusive Access Materials sold by the Publishers and distributed by the Defendant Retailers—and the inability of students to opt-out—is a purposeful result of the anticompetitive schemes undertaken by the Defendants in this case to destroy competition in the Course Materials market, force a captive student audience to purchase new materials for every course from the Publishers, and obtain those materials only from the Defendant Retailers.

C.      **Relevant Markets**

121.    The relevant product market is Course Materials, for which there also are no substitutes or widely used substitutes, and no other product significantly constrains the prices of Course Materials.  A relevant product submarket, or an alternative relevant product market, is Inclusive Access Materials.  As discussed above, there are either no substitutes or no widely used substitutes for Inclusive Access Materials.   No other product significantly constrains the prices of Inclusive Access Materials.   There is no secondary market for Inclusive Access Materials. Therefore, Course Materials and Inclusive Access Materials constitute an economically appropriate market (and/or sub-market) for the purposes of antitrust analysis.

122.    While there is a secondary market for Course Materials, it should be excluded from the relevant market for purposes of the allegations herein.  The secondary market for Course Materials includes the rental and sale of used copies of Course Materials.  The Defendants have grappled with a growing secondary market, where students buy, sell, and rent used copies of Course Materials.  The Publishers' revenues are derived from the "new" material market, and the secondary market diminishes new sales over time.  As discussed previously and further below, the Publishers have engaged in multiple practices to suppress the secondary market for Course Materials (and, for Inclusive Access Materials, have eliminated the secondary market altogether).  The entire secondary market for any specific Course Material—including whether one exists—is controlled by the Publishers.  Moreover, used Course Materials are not reasonably interchangeable with new materials for purposes of the hypothetical monopolist test.  Furthermore, the Publishers have made it plain that their intent is to shift the Course Materials market to solely Inclusive Access Materials or only print books designated as "rental only," to maintain inflated pricing and close the secondary market.

123.     The relevant geographic market for Course Materials—other than Inclusive Access Materials—is the United States.

124.     The relevant geographic market for Inclusive Access Materials is each individual University.  Inclusive Access is marketed, sold, and implemented at the University level by the Publishers, aided by the Defendant Retailers.  The Universities are the principal markets for the sale of Inclusive Access Materials, and also for the sale of Course Materials.  The sale of Inclusive Access Materials occurs on a campus-by-campus basis, and students at one University cannot obtain Inclusive Access Materials through other Universities or other online options.  Thus, no geographic market other than each individual University is a viable substitute or in any way constrains prices, and this is an economically appropriate market for the purposes of antitrust analysis.  Alternatively, the relevant geographic market for Inclusive Access Materials is also the United States.

125.     The Publishers are competitors of each other (ostensibly) in the market to sell Course Materials and Inclusive Access Materials.

126.     The Defendant Retailers are competitors of each other (ostensibly) and competitors of the Plaintiff Retailers and Class members in the market to sell Course Materials and Inclusive Access Materials.

127.     The Plaintiff Retailers and Class members, as both purchasers and sellers of Course Materials and Inclusive Access materials (if there was not a group boycott and conspiracy to restrict access to Inclusive Access materials), are actual and/or potential competitors and/or direct purchaser consumers in the relevant markets affected by the allegations in this case.

128.     The relevant market(s) are conducive to collusion, including because of market concentration, barriers to entry, and inelasticity of demand.  These conditions also favor and give greater power to the sellers—the Defendants—compared to the buyers in the relevant market(s).

129.     The Course Materials market is highly concentrated.  At least 80%, and reportedly closer to 90%, of the sales of new Course Materials across any geographic market are made by the three Publishers.  There is a secondary market for some Course Materials, which should not be included as stated above, but even including the secondary market, the Publishers have a significant market share of the sales of Course Materials.

130.     The Inclusive Access market is highly concentrated.  Upon information and belief, more than 90% of the sales of Inclusive Access materials across any geographic market are made by the three Publishers.  There is no secondary market for sales of Inclusive Access materials.

131.     The Publishers have market and monopoly power in the Course Materials market and Inclusive Access market across any geographic market—both separately and collectively.

132.     At the retailer level, the Defendant Retailers have market and monopoly power in the Inclusive Access market because, as described above, they have 100% of the sales of Inclusive Access Materials at each University where they are the lease-operator.  Even considering a larger geographic market, the Defendant Retailers have combined market and monopoly power in the Inclusive Access market as they are the lease-operator at over 50% of Universities nationwide, accounting for over 60% of total student enrollment at Universities nationwide.

133.     In addition to the percentage market shares, the Defendants' monopoly power is demonstrated by their ability to exclude competitors, to control prices (including prices at supracompetitive levels), to control the secondary market, and to impose unwanted distribution policies on the Universities and consumers, all discussed further herein.

134.    Specifically, the Publishers' market share of at least 80%, and reportedly closer to 90%, of the Course Materials market nationwide evidences their monopoly power.  With the shift to Inclusive Access, the Publishers will increase sell-through and eliminate the secondary market.

135.    High concentration of the relevant market(s) enhances the Defendants' ability and incentive to collude.

136.    The Defendants have the power to control prices as evidenced by the textbook industry's relentless trend of annual price increases between 1980 and 2016, which is also a textbook example of coordinated conduct by the Publishers.  Over the years, the Publishers found that it is more profitable to mutually raise prices rather than compete to offer lower prices.  The Defendants have consistently raised prices above the competitive level for significant periods of time.

137.    The Defendants also have the power to exclude competition in the relevant market—either Course Materials or Inclusive Access—which is evidenced by their past use of unique ISBNs, custom books, creation of the EPEG Best Practices, and current refusal to sell Inclusive Access.

138.    The Defendants are also significantly restricting output by restricting access to Inclusive Access that can only be obtained through the Defendant Retailers.

139.    Defendants' monopoly power was and is protected by substantial barriers to effective entry and expansion.  The history of the Course Materials market is devoid of successful entries (with the same three firms dominating the market for more than thirty years), evidencing the notoriously high barriers to entry.  Entry into the relevant market(s) takes time, a substantial cash investment, a knowledge of the marketplace, relationships and approved accounts with suppliers and consumers, and access to content and the Universities.  For retailers, there is often a

request for proposal process to be a lease operator that requires the bidder to already operate numerous on-campus stores such that the Defendant Retailers are the only ones that can submit an RFP response.  Thus, there are significant barriers to entry into the relevant markets.  In particular, denial of access to the content and to the Universities—especially as it relates to Inclusive Access Materials—severely debilitates or completely prevents a competitor from competing in the retail market, as described above.  Thus, there are significant barriers to entry into the relevant markets, even prior to Defendants' anticompetitive conduct, and the Defendants' conspiratorial, unfair, and exclusionary methods of competition described herein were and are additional barriers to effective entry, expansion, or indeed even continued existence within the relevant market(s).

140.    In addition, there is a history of unsuccessful attempts to enter, and exits from, the relevant markets by other companies.  At one point there were up to two dozen players in the Course Materials publishing market, and now substantial industry consolidation has left the Publishers with dominant market share and weak competitors.  Similarly, significant players have exited the retail market.

141.    If a given change in price triggers a smaller proportionate change in the quantity demands, then the demand for the good or service is said to be inelastic.  That quantity demanded of Inclusive Access Materials or Course Materials is price inelastic.

142.    Students – the end consumer – are assigned which particular Inclusive Access Materials or Course Materials they are required to buy by each University, and this requirement is in no way dependent on or constrained by price.  Thus, as described above, students are a captive market whose demand for Inclusive Access Materials or Course Materials does not fluctuate with price.  Further, the lack of viable substitutes for the Inclusive Access Materials or Course Materials

required by each University contributes to the price inelasticity.  The Course Materials also carry no official list price, allowing for price changes at any time.

143.    This creates a highly-exploitable market for Defendants, who can design and sell materials without regard to the preferences, need, or financial constraints or distress of the ultimate student-consumers, and who can hinder or eliminate competition in the sale of those materials through denial of access.  The Defendants' control of the University and denial of access to the University to the Plaintiff Retailers and the Class members on any terms, let alone reasonable or fair terms, results in the Plaintiff Retailers and the Class members having no practical or reasonable opportunity to obtain or deliver products and no practical ability to otherwise compete.  Such control and denial is contrary to the Publishers' independent business interests and lacks a valid business justification, and ultimately increases the Defendant Retailers' monopoly in the market.

## D.    Anticompetitive Agreements and Behavior

144.    The Defendants entered into conspiracies and contracts in restraint of trade and abused their market power for the purpose of forcing the entire Course Materials market into a single product – Inclusive Access – that would only be available for sale and distribution from the Defendants.  The mechanics of the Inclusive Access scheme were detailed above in Section B. The goal and result of this anticompetitive conduct is narrowing the Course Materials market to be only the Inclusive Access market, eliminating the secondary market altogether, and driving the Plaintiff Retailers and Class members out of business, with the end result of controlling supply and raising prices.

145.    The Publishers entered into one or more agreements to (1) monopolize the relevant market(s) and (2) conduct a group boycott of and concerted refusal to deal with the Plaintiff Retailers and Class members to squash retail competition.  The Publishers also conspired with the

Defendant Retailers and entered into one or more agreements to (1) monopolize the relevant market(s) and (2) conduct a group boycott of and concerted refusal to deal with the Plaintiff Retailers and Class members to squash retail competition.

146.    By agreeing to move toward only selling Inclusive Access Materials to Universities, the Defendants manipulated the market to eliminate competitors and competition and acquired or enhanced their monopoly power in the relevant market(s).  Then, by refusing to sell Inclusive Access Materials to the Plaintiff Retailers and Class members and preventing the Plaintiff Retailers and Class members from obtaining Inclusive Access Materials or potential substitutes by other means, the Defendants prevented the Plaintiff Retailers and Class members from competing with Defendant Retailers and remaining in the market to sell Inclusive Access Materials or Course Materials.

147.    This result was the common purpose for which Defendants worked together to increase their own profits at the expense of the market, competition, and consumers.  The Publishers have made it plain that their intent is to shift the market to Inclusive Access, and to the extent print will be available at all, it will be in the form of rentals that cannot be resold.  On a May 1, 2019 joint investor call for the merger of Defendants Cengage and McGraw-Hill, Dr. Bannerjee of McGraw-Hill stated plans to "[take] out this used secondary market book enterprise that has really been a disruptor for us."  He specified a four to six year timeline, and projected that they would be "more than half way through" within two and a half years.

148.    The Defendants' anticompetitive actions have created a 100% sell-through and captive market where all students have to buy all new Inclusive Access Materials from the Publishers through the Defendant Retailers (or the Universities, when a Defendant Retailer was not present).  All of this conduct was knowing and intentional.  The Defendants have already

achieved many of their goals and harmed the market and competition at Universities across the country.  Once they have fully eliminated competition, the Defendants will continue to raise prices and reduce quality, service, and innovation, unchecked by any competitive market forces.

149.    The powerful Publishers all desired to eliminate the secondary market and choices for student-consumers in Course Materials and move the market to solely Inclusive Access Materials for which the Publishers would receive 100% of sales to students in every class, every semester at the Universities, at whatever price the Publishers choose to set.  Inclusive Access Materials in their current form represent an unprecedented change in both the product offered by the Publishers and the access controlled by the Publishers.  As discussed in Section B, Inclusive Access is not what students want or need and is the opposite of innovation.

150.    Each of the Publishers began to push Inclusive Access – with the same mechanics – to the Universities with which they are associated, especially for the core and lower-level classes that have the highest student enrollment, and therefore the largest economic impact on the Publishers.  The Publishers did not independently arrive at this decision to create a standardized and "new" product across the market.

151.    Senior executives of the Defendants frequently and privately communicated with one another regarding various topics in furtherance of the conspiracy, including the mechanics of the Inclusive Access scheme, elimination of the secondary market, monopolization of the relevant markets, and the group boycott and concerted refusal to deal with the Plaintiff Retailers and Class members.  The Defendants had multiple opportunities to conspire, including at activities related to

EPEG, NACS, coordinated activities in relation to rule-making for the Higher Education Opportunity Act, and merger discussions between the Defendants.

152.    It is known that the Publishers communicated with one another and had meetings regarding Inclusive Access (and related agreements and exclusionary activities) in at least the following instances:  conducting joint pilot programs for Inclusive Access Materials at Universities (including specifically UC-Davis), coordination of efforts related to U.S. Department of Education rulemaking that could affect the delivery and price of Inclusive Access Materials, and meetings and other activities of the NACS trade association.  It is known that the Publishers communicated with one another in the following instances, and upon information and belief, regarding Inclusive Access (and related agreements and exclusionary activities):  meetings and other activities of the EPEG trade association and activities related to the proposed merger of Defendants Cengage and McGraw-Hill.  The Publishers had many other opportunities to communicate and conspire through these and other activities.

153.    The Publishers arranged and agreed upon a system by which they would all accomplish development and conversion of the market to exclusively Inclusive Access Materials (and other new Course Materials in some instances), restricting retailer access to the Inclusive Access Materials (and other new Course Materials), and the monopolization of the relevant markets.

154.    The system included the use of joint pilot programs for Inclusive Access Materials at Universities.  For example, in the Fall 2014, a pilot began at the University of California, Davis with over 3,000 students across the ten largest courses with Defendants Cengage, McGraw-Hill,

and Pearson.  Thereafter, in the Winter 2015, the pilot at UC Davis continued with over 5,000 students in 19 courses with Defendants Cengage, McGraw-Hill, and Pearson and Norton.

155.    The system also included coordination of efforts related to U.S. Department of Education rulemaking that could affect the delivery and price of Inclusive Access Materials.

156.    The system also included the use of trade associations.  The Publishers formed EPEG in 2016.  The stated purpose of EPEG was for the Publishers to collectively develop, implement, and enforce the EPEG Guidelines, which had the stated goal of eliminating counterfeit textbooks in the marketplace.  In reality, the EPEG Guidelines were intended to and have the effect of the Publishers controlling who can buy and sell the products in the marketplace, and the Publishers have coercively used the EPEG Guidelines against the Plaintiff Retailers and Class members to reduce supply and access, limit consumer choice, and raise prices of Course Materials. The EPEG Guidelines limit from whom the Plaintiff Retailers can buy books, which hinders the secondary market.  Further, the EPEG website publicly identified a "white list" of those companies who were following the EPEG Guidelines and encourage others not to buy from or sell to anyone who was not on the "white list," thereby creating a "black list."  In essence, the EPEG Guidelines constrain retailers' use of Amazon and similar online platforms to purchase used books in order to continue to do business with the Publishers and other suppliers.  The NACS trade association also was utilized by the Publishers and the Defendant Retailers to push the Inclusive Access Materials conspiracy, culminating in the exclusion of competing retailers from the organization altogether in 2019.

157.    For the conversion of the market to Inclusive Access Materials to be most effective and to move more quickly and more easily, the Publishers recognized the Defendant Retailers must be on board.  The Defendant Retailers could assist in moving the market to Inclusive Access

Materials, and the agreements between the Defendant Retailers and the Universities for operation of the retail locations could be leveraged and manipulated to create the necessary and desirable exclusivity between the Publishers and the Defendant Retailers.  Similarly, the Defendant Retailers recognized the opportunity to join the Publishers in moving the market to Inclusive Access Materials and to secure themselves as the exclusive providers in this artificial "new" market.

158.    In furtherance of the conspiracy, the Defendant Retailers encouraged the Publishers, provided the Publishers their full cooperation, and participated in all aspects of the conspiracy, including pushing and implementing the Inclusive Access scheme at the Universities. The Defendant Retailers desired to eliminate retail competitors as well as the secondary market and choices for student-consumers in Course Materials.  Prior to the Inclusive Access scheme, the Defendant Retailers had an average capture rate of 35-40% of the student purchases of Course Materials at a University.  Through their agreements with the Publishers whereby the Publishers agreed not to sell the Inclusive Access Materials to the Plaintiff Retailers or Class members, the Defendant Retailers are the exclusive source of Inclusive Access Materials at their respective Universities, and receive 100% of sales to students for every class, every semester and therefore 100% of the profits at those Universities.  This arrangement eliminates all substitute sources for the Inclusive Access Materials (including the Plaintiff Retailers) and any potential competition on price, terms, or other benefits to the student-consumers.

159.    To be a lease-operator of a University bookstore location, the Defendant Retailers enter into agreements with the Universities.  Those agreements contained an exclusivity provision for the purpose of ensuring that the University would have only one "official" location—the one operated by the Defendant Retailer.  It did not prevent the Publishers from selling to other retailers, and it did not prevent students from making purchases from other retailers.  It did not affect who

could purchase or sell materials or where they could be purchased or sold.  For example, a typical exclusivity provision in a University-Defendant Retailer agreement would state:  "The Bookstore shall be [the University's] exclusive on campus buyer and seller of all required, recommended or suggested course materials and supplies. . . ."

160.    Using these agreements between the Defendant Retailers and the Universities as a base, the Defendants executed additional agreements (including the "So-Called License Agreements" and "Master Exclusivity Agreements" defined below) – both between themselves and with the Universities – to create an exclusive dealing system that dictates who can sell what to the students and where.  These agreements are collectively referred to as the **"Exclusive Dealing Agreements."**  The Defendant Retailers from the University location, and no one else from any other location, exclusively can sell Inclusive Access Materials to the students.

161.    Since the time of the Inclusive Access conspiracy, the Defendant Retailers have significantly increased the incentives to the Universities to be certain that the Defendant Retailers become or remain the lease-operator of the University bookstore locations.  For example, the Defendant Retailers are providing a high-dollar payment to the Universities in order to secure their status as lease-operator.  These payments by the Defendant Retailers, while not unheard of prior to Inclusive Access, are now at astronomical amounts that are far beyond a payment that would be justified by the Defendant Retailers' typical profitability of a University location or in the Defendant Retailers' self-interest.  In some instances, the Defendant Retailers are now paying the Universities an up-front sum of millions to be the lease-operator of the University bookstore location.

162.    "On campus" bookstores also traditionally return a percentage of sales at the University bookstore locations.  According to documents obtained through FOIA requests, on sales

of most products, the Defendant Retailers are providing the University payments ranging from 9.5 to 14% of <u>gross</u> sales. But for sales of Inclusive Access Materials, Defendant Retailers are providing the University lower payments—in many instances, only 5-8% of gross sales.

163.   The actions of the Defendant Retailers provide further evidence of the conspiracy and the Defendant Retailers' involvement in and knowledge of that conspiracy. The Defendant Retailers' increased up-front payments to the Universities make economic sense only if the Defendant Retailers know that the University will be forced to use Inclusive Access— regardless of which Publishers are chosen by the University—and that the students will be forced to purchase that Inclusive Access from the Defendant Retailers, thereby significantly increasing the Defendant Retailers sell-through numbers and gross profit. Further, the Defendant Retailers lowering the percentage amount provided to Universities on sales of Inclusive Access Materials equates to Defendant Retailers retaining more of the sales price of those products, which also indicates that Defendant Retailers know that the University will be forced to use Inclusive Access and capitalized on that fact.

164.   The Defendant Retailers further assist the conspiracy by their misconduct in blocking any potential opt-out or workaround for Inclusive Access (as discussed above in Section B) and through misinformation campaigns and other unfair and anticompetitive actions meant specifically to exclude and harm their competitor retailers—the Plaintiff Retailers and Class members (as discussed further below).

165.   The Defendants responded to competition – including from the Plaintiff Retailers – by adopting restrictive and exclusive distribution policies that were intended to, expected to, and actually did block the ability of the Plaintiff Retailers to be in the Inclusive Access Materials market and the ability of any other competitors to enter or expand in the market. These policies

further were intended to, expected to, and actually did block or at a least severely impede the ability of the Plaintiff Retailers to be in the Course Materials market and the ability of any other competitors to enter or expand in the market.  The policies further allowed the Defendants to acquire, maintain, or enhance their monopoly power.

166.    The Defendants entered into these agreements and acted in concert with the specific intent to maintain and share in monopoly profits by eliminating competition (including amongst themselves) and excluding rival retailers.

167.    The Inclusive Access scheme would only work if all of the Publishers participated in pushing and locking in a critical mass of students and classes at the Universities to Inclusive Access.  Therefore, the Publishers collectively agreed and established agreements to be used for Inclusive Access that locked in the core and lower-level classes, which are the largest University classes with the highest student enrollments and therefore have the largest economic impact.  The Publishers also used agreements that required guarantees of classes and/or student numbers and an increase in those numbers over time.  The Publishers agreed-upon plan was eventually to convert every class to Inclusive Access.  The mechanics and timing of the rollout of Inclusive Access has been the same for all the Publishers, and the exclusivity discussed below is with both the Defendant Retailers.

168.    The Defendant Retailers were only interested in the Inclusive Access scheme if it also resulted in exclusivity for the Defendant Retailers in sales of Inclusive Access (and any other new Course Materials) to students at the Universities.  The Defendant Retailers' involvement was beneficial to the Publishers' scheme as set forth above, and exclusivity for the Defendant Retailers

was also beneficial in its removal of the disruptive market force of the Plaintiff Retailers and Class members, which all the Defendants desired to squash.

169.    The Publishers all entered into agreements with the Universities and the Defendant Retailers to "license" the Inclusive Access on an exclusive basis to the Defendant Retailers to sell to students at the University (the **"So-Called License Agreements"**). The Exclusive Dealing Agreements have similar, and in some instances, the same language, as well as the same terms and conditions.  For example, the So-Called License Agreements would provide that:

> Without in any way limiting or amending the terms of the agreements by and between [the Defendant Retailer] and [University], Publisher shall work only with [the Defendant Retailer] to provide [University] the Licensed Program and Licensed Program Materials.

170.    Upon information and belief, the Publishers also entered into master exclusivity agreements (the **"Master Exclusivity Agreements"**) with the Defendant Retailers, which results in the same exclusivity for the Defendant Retailers to sell Inclusive Access Materials as the So-Called License Agreements, to be used in the case where there is not a University agreement to accomplish this purpose.  The Master Exclusivity Agreements eliminate the need for the Publishers to enter into the So-Called License Agreements with the Universities to accomplish the exclusivity and permit faster growth of the Inclusive Access Program with the multiple Publishers throughout the country.

171.    The purpose and effect of these exclusive dealing policies, no matter which Exclusive Dealing Agreements are utilized, has been and is to compel Universities and students to deal with the Defendants on an exclusive or nearly exclusive basis for the Inclusive Access Materials and/or Course Materials.  The Plaintiff Retailers have discussed with each of the Publishers in an attempt to gain access to the ability to purchase the Inclusive Access Materials,

and each has refused while supplying the same pre-textual explanations discussed previously in Section B.

172. Prior to the Defendants' anticompetitive actions and exclusive dealing policies, the Plaintiff Retailers had excellent relationships with the Universities and students. On average, Plaintiffs' physical stores captured 25-50% of the student market at its University, and the Plaintiff Retailers' online stores did over $20 million in business each semester. Students are interested in purchasing from the Plaintiff Retailers (and other Class members), but they were and are unable to do so under the terms of the Defendants' exclusive dealing policies and have instead exclusively purchased from the Defendant Retailers, contrary to their preference. For example, thousands of students at the University of North Texas signed a petition calling for the school to end Inclusive Access.

173. The Defendants' exclusive dealing policies have foreclosed the Plaintiff Retailers and Class members from a substantial volume of sales opportunities in the market, and, by doing so, have minimized, impeded, and prevented the Plaintiff Retailers' ability to compete effectively in the market. The exclusive dealing arrangements foreclose 100% of the Inclusive Access Materials market and a substantial portion of the Course Materials market, due to the approximately 90% of the Course Materials market controlled by the Publishers and the approximately 60% of the lease-operated retail stores and University student population controlled by the Defendant Retailers. As discussed in Section B, there is no alternative distribution channel and no meaningful substitute products. And, as discussed in Section A, retail stores must offer all products needed by students in order to compete.

174. As set forth above, in almost every case where the Plaintiff Retailers have encountered Inclusive Access Materials pushed by the Publishers, the Publishers refused to sell

the Inclusive Access Materials to the Plaintiff Retailers in any format and under any terms.  In the very few instances where the Publishers agreed to sell Inclusive Access Materials or a substitute product to the Plaintiff Retailers – after heavy communications by the Plaintiff Retailers with the Publishers and Universities – the Publishers only offered to sell to the Plaintiff Retailers at a higher price compared to that offered to the Defendant Retailers operating at the same Universities and against whom the Plaintiff Retailers are directly competing for the same student customers and have not offered the same discounts and terms and conditions of sale.  This is completely contrary to the way the Publishers have dealt with the Plaintiff Retailers for decades.

175.    For example, at the University of Texas at Arlington, Plaintiff Campus Book Company, Inc. operated a retail location that competes with Defendant Follett's retail location. For courses at the University, Defendant Pearson originally refused to sell any Inclusive Access Materials to Plaintiff Campus Book Company, Inc., giving a pre-textual explanation that the University required exclusivity, thereby preventing Defendant Pearson from providing Inclusive Access Materials through any retailer other than Defendant Follett, who is the lease-operator of that University's on-campus bookstore.  The University denied requiring any such exclusivity, and eventually Pearson agreed to allow Plaintiff Campus Book Company, Inc. to sell access to Inclusive Access Materials to students.  However, Pearson then sold this product to Plaintiff Campus Book Company, Inc. at prices that were substantially higher than those for sales to Defendant Follett (approximately $95-$125 per product when, upon information and belief, the Defendant Retailer was charged approximately $45-$85 for the Inclusive Access per student) around the same time.  Also, Pearson imposed onerous and unreasonable additional terms, such as requiring Plaintiff Campus Book Company, Inc. to send students to Defendant Follett's retail location to "confirm" the product purchased from Plaintiff.  Due to these discriminatory prices and

terms, Plaintiff Campus Book Company, Inc. was effectively unable to sell the product and unable to compete with Defendant Follett for sales to students.  Plaintiff Campus Book Company, Inc. was forced to close its doors in October 2019.

176.    Similarly, at Eastern Kentucky University, the Publishers offer a supplement print product for Inclusive Access courses used where the student chooses to buy a print book to go along with their auto-billed Inclusive Access Materials.  The supplement print product is available for purchase by Plaintiff CBSKY, Inc.  However, the Publishers charge Plaintiff CBSKY, Inc. a significantly higher price for the workable substitute as shown in the following examples:

| Class | Number | Book Title | Defendant Retailer *List Price (New)* of Book to Student | *Cost* to Plaintiff Retailer for Book |
|---|---|---|---|---|
| ACC | 201 | Horngren's Financial Accounting Loose-leaf | $57.15 | $119.99 |
| ACC | 202 | Managerial Accounting Loose-leaf | $57.15 | $164.99 |
| ACC | 327, 527, 727 | Horngren's Cost Accounting | $57.15 | $164.99 |
| ART | 200 | World of Art | $21.45 | $122.66 |
| BIO | 101 | Biology: Today + Tomorrow | $46.65 | $101.25 |
| MATH | 105 | Using + Understanding Math Loose-leaf | $57.15 | $109.99 |
| MATH | 112A | College Algebra in Context | $57.15 | $119.99 |
| PHY | 101 | Conceptual Physics Loose-leaf | $57.15 | $119.99 |
| STA | 215 | Statistics: Art + Science of Learning | $57.15 | $114.99 |

177.    The case of Inclusive Access Materials is the first time the Publishers refused to sell the same Course Materials to the Plaintiff Retailers at the same price as the Defendant Retailers at the relevant University location.

178.    In these few instances where the Plaintiff Retailers were sold any product related to Inclusive Access Materials by the Publishers, the Defendant Retailers knew from the Publishers that they were receiving a lower price than the Plaintiff Retailers.  Further, the Defendant Retailers

knowingly induced and received the lower price from the Publishers for the Inclusive Access Materials pursuant to the continuing conspiracy, whereby the Publishers agreed with the Defendant Retailers that Inclusive Access Materials would only be sold to and through the Defendant Retailers for any University at which the Defendant Retailers operated.

179. The Defendant Retailers also commonly engaged in competition-reducing practices that have continued through the time of and in addition to their participation in the conspiracy to implement the exclusive Inclusive Access. Timely access to information regarding faculty adoption of Course Materials is necessary for retailers to have correct materials available for students timely and at competitive prices—*i.e.*, it is necessary to compete (and disclosure of such information is required pursuant to federal regulations). Universities route this information to their "on campus" stores who are supposed to, and traditionally have, made this information publicly available and/or shared this information timely with all other retailers, including the Plaintiff Retailers. However, in the last few years, contemporaneously with the conspiracy alleged herein, the Defendant Retailers (who are the keepers of this information as lease-operators of the "on campus" stores) have purposefully impeded any other retailers, including the Plaintiff Retailers, from obtaining this information necessary to compete.

180. For example, the Defendant Retailers have (1) purposefully provided the Plaintiff Retailers with incorrect or outdated Course Materials adoption information, when the Defendant Retailers had the correct information available; (2) refused to provide the Plaintiff Retailers with Course Materials adoption information, either ever or in a timely manner so that orders could be made, when the Defendant Retailers had the information available; and (3) failed to timely post or update the public listing of Course Materials adoption information, when the Defendant Retailers had the information available. Further, the Defendant Retailers had this

competition-reducing behavior included as part of the conspiracy and the Exclusive Dealing Agreements—pursuant to the Exclusive Dealing Agreements, the Defendant Retailers are claiming that Course Materials adoption information from the Universities is "proprietary information" and cannot be accessed by anyone other than the Defendant Retailers.

181.    The Defendant Retailers also have blocked the efforts of the Plaintiff Retailers to obtain Course Materials adoption information through other means.   In the past, the Plaintiff Retailers also have sought and gathered this information directly from the faculty or the University.   But now the Defendant Retailers are attempting to prevent direct communications between any other retailers and the faculty by means such as disseminating or orchestrating "official" communications to faculty, providing that Course Materials adoption information should be submitted *only* to the Defendant Retailers, and disseminating or orchestrating "official" communications to faculty stating that other retailer communications are "spam" or otherwise illegitimate.

182.    As detailed above, the Defendants have engaged in an ongoing and continuing conspiracy to restrain trade, including by eliminating competition, controlling the market, monopolizing the market, raising pricing, and eliminating substitute products through repeated and overt acts in furtherance of such conspiracy.   Each semester, each University, campus, or course that adopts Inclusive Access at the insistence or urging of the Defendants is an overt act in furtherance of the illegal conspiracy and results in continuing competitive harm.   The Defendants' behavior continues and does result each semester in further conversions.   This ongoing anticompetitive conduct by Defendants has caused and continues to cause the Plaintiff Retailers ongoing harm.

183.    Each of the Exclusive Dealing Agreements – many of which were executed between 2016 and 2019 and which upon information and belief continue to be executed – is an overt act that advances the illegal conspiracy and results in competitive harm, and further, each time the Exclusive Dealing Agreements are relied upon to refuse retailers, including the Plaintiff Retailers, the ability to obtain Inclusive Access Materials also advances the illegal conspiracy and results in competitive harm and injury to the Plaintiff Retailers.  As a result, each of the Exclusive Dealing Agreements and each time such agreements are relied upon to refuse access to retailers, including the Plaintiff Retailers, to Inclusive Access Materials constitutes an overt act in furtherance of the Defendants' ongoing and continuing conspiracy.

184.    The Defendants have further continued to engage in communications and other activities related to furthering the scheme, as evidenced by the formation of EPEG in 2016 and its continued operation, and the continued participation in NACS, including the 2019 bylaw change that resulted in exclusion of the Plaintiff Retailers and Class members from NACS going forward. These communications and other activities also constitute overt acts by the Defendants in furtherance of their ongoing conspiracy.

185.    The totality of the Defendants' continued and repeated anticompetitive conduct has caused and continues to cause ongoing injury to the Plaintiff Retailers in, among other ways, lost sales, and has excluded the Plaintiff Retailers and Class members from the market and eliminated competition.

186.    The Defendants' concerted actions were naturally concealed and the Defendants also took affirmative acts to mask and conceal their illegal conspiracy.  The Defendants engaged in an active misinformation campaign, designed to trick the market – including students, Universities, and competitors – into believing that Inclusive Access was the result of consumer

demand and technological advances (which was not true, as detailed in Section B), when in reality it was the result of Defendants' conspiracy.   Further, the Publishers concealed their conspiracy by communicating to the Plaintiff Retailers that the exclusivity was a requirement of the Universities when in reality, the Defendants made that decision in furtherance of their conspiracy.

187.   Because of the Defendants' efforts to obscure and mask their conspiracy, the Plaintiff Retailers did not learn, and could not have learned, of the complex conspiracy crafted by the Defendants until at least Inclusive Access was adopted on multiple campuses at which the Plaintiff Retailers had a store location and until the Plaintiff Retailers were denied the ability to purchase Inclusive Access Materials.   The first time the Plaintiff Retailers heard of Inclusive Access at multiple locations from multiple Publishers was in 2015.   And it was not until 2016 that the Plaintiff Retailers were first able to attempt to gain access to Inclusive Access Materials and were denied such access.   Following multiple denied attempts with similar responses from multiple Publishers, the Plaintiff Retailers exercised diligence in seeking and uncovering more information.   The Plaintiff Retailers have actively sought information regarding Inclusive Access through open records requests and communications with the Publishers.   The Exclusive Dealing Agreements of which the Plaintiff Retailers are aware, based on these open records requests, were executed or amended between 2016 and 2019.   The trade association activities providing further information to the Plaintiff Retailers also did not occur until 2016 for EPEG and 2019 for NACS, respectively.

188.   The anticompetitive actions of the Defendants have had the effect of restraining, suppressing, and eliminating competition in the sale of Inclusive Access Materials and Course Materials. The Defendants' conduct adversely affected competition, the Plaintiff Retailers and Class members, and consumers by (i) reducing or eliminating the output of and access to

Inclusive Access and Course Materials; (ii) eliminating or significantly reducing price competition for Inclusive Access and Course Materials; (iii) impeding or blocking the ability of actual or potential competitors to enter or expand sales in the relevant market; (iv) significantly raising barriers to entry for rivals; (v) reducing consumer choice among products and competing retailers; (vi) reducing quality and stifling innovation for Course Materials; and (vii) artificially inflating the price of Course Materials and Inclusive Access Materials above competitive levels.

189.    The Defendants' anticompetitive actions have had the effect of creating and/or enhancing a monopoly in the sale of Inclusive Access Materials and Course Materials in the relevant market(s) for both the Publishers as suppliers and the Defendant Retailers as retailers. These monopolies completely, or at least substantially, foreclose competition at the Universities where the Publishers and the Defendant Retailers operate and function to eliminate the secondary market, competition (on price or terms or otherwise), and competitors.

190.    Absent the Defendants' anticompetitive conduct and the substantial foreclosure and reduction of effective competition caused by such conduct, the Defendants would have faced additional competition, including from the Plaintiff Retailers.

191.    There are no legitimate pro-competitive efficiencies that justify the Defendants' conduct or that outweigh the substantial anticompetitive effects of that conduct.

192.    The Plaintiff Retailers and the Class members have suffered antitrust harm because their loss of business, profits, and ability to compete are directly and predictably related to the Defendants' conduct, their conspiracy, and exclusionary activities—in fact, it is the result intended by the anticompetitive activities.  Damages for total or partial exclusion of a competitor from the market reflects injury for which the antitrust laws were intended to provide redress.

193.    As of the filing of this Complaint, some of the Plaintiff Retailers' stores have closed.  Due to the conspiracy, group boycott, and exclusionary activities, they did not have necessary access to purchase and sell the Course Materials that would allow them to compete in the market.  Other stores, while still operating, have seen drastic decreases in gross sales.  It is only a matter of time until all the Plaintiff Retailers' stores will have to close due to the Defendants' anticompetitive efforts.  And at that time, the Defendants will be the only remaining competitors and further will monopolize both production and distribution of Course Materials, with highly detrimental effects on the market and student-consumers.

194.    Prior to the Defendants' conspiracy and exclusionary activities, the Plaintiff Retailers' revenues and profits were growing year-over-year.  Thereafter, where the Inclusive Access conspiracy was implemented, the Plaintiff Retailers' revenues and profits have plummeted.  In some cases, the Plaintiff Retailers have been so drastically impacted by the Defendants' exclusionary and anticompetitive activities that they have been forced to close.  Moreover, the Plaintiff Retailers' units in web sales have also significantly been impacted by Inclusive Access.

195.    The full amount of damages to the Plaintiff Retailers and Class members is presently unknown and will be calculated after discovery for proof at trial.

## V.      INTERSTATE TRADE AND COMMERCE

196.    During the Class Period, the Defendants produced, manufactured, distributed, marketed, and/or sold Course Materials, including Inclusive Access, through the means of interstate commerce in a continuous and uninterrupted flow of transactions in interstate commerce throughout the United States, including into, through, and within this District.  The Defendants' actions, including their conspiracies and monopolization, had a direct and substantial effect on interstate trade and commerce, including through raising the price of Course Materials (to the

Plaintiff Retailers, Class members, and ultimate student-consumers), artificially limiting capacity and reducing supply (including of Course Materials available to the Plaintiff Retailers, Class members, and ultimate student-consumers), and eliminating secondary markets and competitors (including the Plaintiff Retailers and Class members) in the market for Course Materials.

197.    The Defendants have used instrumentalities of interstate commerce to produce, market, distribute, and/or sell Course Materials, including Inclusive Access, and to accomplish their anticompetitive conduct.

## VI.    CLASS ALLEGATIONS

198.    The Plaintiff Retailers bring this class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) for damages sought and (b)(1) and (b)(2) for injunctive and declaratory relief sought, on their own behalf and as representatives of the following class of persons and entities (the "**Class**"):

> All persons or entities in the United States who were in the business of selling Course Materials at off-campus retail outlets serving students at the Universities or online during the Class Period.

199.    Excluded from the Class are the Defendants' and their parents, subsidiaries, and affiliates, whether or not named as a Defendant in this Complaint, federal government entities, and instrumentalities of the federal government.

200.    The Plaintiff Retailers reserve the right to amend the definition of the Class upon further investigation, including at the time when the Plaintiff Retailers move for class certification.

201.    The Plaintiff Retailers do not know the exact size of the Class at the present time, but upon information and belief, the Class includes over 100 members.  Therefore, the Class is so numerous that joinder of all members in this action is impracticable.

202.     The Plaintiff Retailers' claims are typical of the claims of the Class, and the Plaintiff Retailers will fairly and adequately protect the interests of the Class.     The Plaintiff Retailers' interests are coincident with, and not antagonistic to, those of the Class members.   The Plaintiff Retailers have retained competent counsel experienced in complex antitrust and consumer protection class action litigation.

203.     Class treatment is superior to any alternatives for the fair and efficient adjudication of the controversy alleged in this Complaint.  Class treatment will permit the large number of Class members to prosecute their claims based on common legal and factual issues in a single forum and proceeding and thus to pursue such claims simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender for the parties and the courts.  There are no difficulties likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternatives exist for the fair and efficient adjudication of this controversy.

204.     There are questions of law and fact common to all members of the Class, and that predominate over any questions affecting solely individual members of the Class.     The Defendants' anticompetitive conduct, the effects of such violations, and the relief sought are all issues or questions that are common to the Plaintiff Retailers and the other members of the Class. These common questions include, but are not limited to:

        a.   Whether the Publishers engaged in a combination and conspiracy among themselves to unreasonably restrain trade by artificially limiting capacity and reducing supply, eliminating necessary access, using trade associations to set pre-textual standards, and implementing concerted refusals to deal with the Plaintiff Retailers and Class members;

b. Whether the Defendant Retailers engaged in a combination and conspiracy among themselves to unreasonably restrain trade by artificially limiting capacity and reducing supply, eliminating necessary access, using trade associations to set pre-textual standards, and concerted refusals to deal with the Plaintiff Retailers and Class members;

c. Whether the Defendants engaged in a combination and conspiracy among themselves to unreasonably restrain trade by artificially limiting capacity and reducing supply, eliminating necessary access, using trade associations to set pre-textual standards, and concerted refusals to deal with the Plaintiff Retailers and Class members and eliminating competition for Course Materials through exclusive dealing arrangements;

d. Whether the Defendants engaged in exclusive dealings, and other restrictive, exclusionary, unfair, and anticompetitive conduct;

e. Whether the Defendants were in a combination and conspiracy to monopolize the market for Course Materials at Universities;

f. The duration and extent of the conspiracies alleged herein;

g. Whether these alleged conspiracies violated Sections 1 and 2 of the Sherman Act;

h. Whether the Publishers illegally monopolized the market for Course Materials at Universities in violation of Section 2 of the Sherman Act;

i. Whether the Defendants participated in a discriminatory pricing scheme for Course Materials, including Inclusive Access;

j.   Whether the Defendants unfairly and deceptively restrained competition in the market for Course Materials at Universities;

k.   Whether the Defendants' conduct, as alleged in this Complaint, caused injury to the business or property of the Plaintiff Retailers and the Class members;

l.   The effect of the alleged conspiracies and monopolization on the capacity, supply, and access in the market for Course Materials at Universities;

m.   The appropriate measure of damages; and

n.   The appropriate injunctive relief.

205.   The Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole.   Prosecuting separate actions by and against individual Class members also would create a risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for the Defendants or (2) adjudications that, as a practical matter, would be dispositive of the interests of other Class members.

## VII.   CLAIMS FOR RELIEF

### COUNT 1:  RESTRAINT OF TRADE (15 U.S.C. § 1) –CONSPIRACY IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT AGAINST PUBLISHERS AND EPEG

206.   The Plaintiff Retailers incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of this Complaint.

207.   The Publishers and EPEG and unnamed conspirators entered into and engaged in a continuing contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) to artificially limit capacity and reduce supply, eliminate access, and eliminate secondary markets and competitors in the market for Course Materials at colleges and universities, with the end goal and result of raising prices.  As set

forth in this Complaint, the Publishers agreed together in violation of Section 1 to do so through (1) understandings and agreements to or with the effect to fix, raise, maintain, and stabilize prices or terms and conditions of the sale of Course Materials and Inclusive Access Materials, including through agreements that restrict capacity, supply, and access to Course Materials and Inclusive Access Materials (behavior collectively referred to as the "**Horizontal Price Fixing**"), (2) concerted refusals to deal with and group boycotts of Plaintiff Retailers and other Class members (behavior collectively referred to as the "**Horizontal Group Boycott**"), and (3) utilization of EPEG to agree upon and implement standardized conduct (including the Horizontal Price Fixing) through concerted action and setting pre-textual standards to restrain trade (behavior collectively referred to as the "**Trade Association Violations**").

208.    In engaging in the Horizontal Price Fixing, the Horizontal Group Boycott, and the Trade Association Violations, the Publishers engaged in the same or similar conduct at or near the same time using standardized materials, contracts, and behavior.  Many of the Publishers' actions related to the sale of Course Materials and Inclusive Access were against their independent self-interest, including their refusal to sell to other willing customers such as the Plaintiff Retailers. EPEG acted for the Publishers, and the Publishers each acted through EPEG.  The Publishers have had multiple opportunities for collusion as set forth in this Complaint, including through their involvement in EPEG, events for the NACS, coordinated activities in relation to rule-making for the Higher Education Opportunity Act, and merger discussions between Defendants McGraw-Hill and Cengage.

209.    The Publishers possess and exercise market power in the relevant product and geographic markets identified in this Complaint.

210.    The Horizontal Price Fixing, Horizontal Group Boycott, and Trade Association Violations each constitute a *per se* violation of Section 1 of the Sherman Act.

211.    In the alternative, the Horizontal Price Fixing, the Horizontal Group Boycott, and the Trade Association Violations caused anticompetitive effects that substantially outweigh any procompetitive justifications, if any exist, and under a rule of reason analysis, the Horizontal Price Fixing and the Horizontal Group Boycott violate Section 1 of the Sherman Act.

212.    The Publishers' and EPEG's anticompetitive actions have harmed competition and caused unreasonable restraints of trade.  As a result of the Publishers' and EPEG's unlawful conduct, the price of Course Materials and Inclusive Access Materials was raised, fixed, maintained, and stabilized in the United States at a level higher than they would have been in the absence of the anti-competitive conduct alleged in this Complaint and the capacity, supply, and access of Course Materials and Inclusive Access Materials has been restricted, limited, reduced, and/or eliminated.

213.    The Publishers produced, manufactured, distributed, and sold Course Materials and Inclusive Access Materials through the means of interstate commerce in a continuous and uninterrupted flow to customers located in states other than the states in which the Publishers market and sell such products.  The Publishers and EPEG have also accomplished their horizontal scheme through interstate commerce.  The Publishers' and EPEG's anticompetitive actions were intentionally directed at the markets identified in this Complaint and had a substantial and foreseeable effect on interstate commerce.

214.    For purposes of formulating and effectuating their contract, combination or conspiracy, the Publishers and EPEG did those things they combined or conspired to do, including

the Horizontal Price Fixing, the Horizontal Group Boycott, the Trade Association Violations, and the acts, practices, and course of conduct set forth in this Complaint.

215.   As a result of the Publishers' and EPEG's unlawful conduct, the Plaintiff Retailers and the Class members have been injured in their businesses and property in that they have paid more for Course Materials than they otherwise would have paid in the absence of the Publishers' unlawful conduct, have been excluded from the sale of Inclusive Access Materials, have had competition for Course Materials and Inclusive Access Materials restrained, suppressed, or eliminated, and have been deprived of the benefits of free and open competition including elimination of the secondary market for Course Materials.

216.   As a direct and proximate result of the Publishers' and EPEG's scheme, the Plaintiff Retailers and the Class members have been injured and financially damaged in their respective businesses and property, in amounts that are presently undetermined.  Accordingly, the Plaintiff Retailers, on behalf of themselves and the Class members, seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including attorneys' fees.

### COUNT 2:  RESTRAINT OF TRADE (15 U.S.C. § 1) –CONSPIRACY IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT AGAINST DEFENDANT RETAILERS

217.   The Plaintiff Retailers incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of this Complaint.

218.   The Defendant Retailers and unnamed conspirators entered into a continuing contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) to artificially limit capacity and reduce supply, eliminate access, and eliminate secondary markets and competitors in the market for Course Materials at colleges and universities, with the end goal and result of eliminating competitors and raising prices.  As set

forth in this Complaint, the Defendant Retailers agreed together in violation of Section 1 to the Horizontal Price Fixing and the Horizontal Group Boycott.

219.    In engaging in the Horizontal Price Fixing and the Horizontal Group Boycott, the Defendant Retailers engaged in the same or similar conduct at or near the same time using standardized materials, contracts, and behavior.  Many of the Defendant Retailers' actions related to the sale of Course Materials and Inclusive Access were against their independent self-interest, including their payments to Universities to acquire lease-operator status at Universities.  The Defendant Retailers have had multiple opportunities for collusion as set forth in this Complaint, including through their involvement in NACS.

220.    The Defendant Retailers possess and exercise market power in the relevant product and geographic markets identified in this Complaint.

221.    The Horizontal Price Fixing and the Horizontal Group Boycott each constitute a *per se* violation of Section 1 of the Sherman Act.

222.    In the alternative, the Horizontal Price Fixing and the Horizontal Group Boycott caused anticompetitive effects that substantially outweigh any procompetitive justifications, if any exist, and under a rule of reason analysis, the Horizontal Price Fixing and the Horizontal Group Boycott violate Section 1 of the Sherman Act.

223.    The Defendant Retailers' anticompetitive actions have harmed competition and caused unreasonable restraints of trade.  As a result of the Defendant Retailers' unlawful conduct, the price of Course Materials and Inclusive Access Materials was raised, fixed, maintained and stabilized in the United States at a level higher than they would have been in the absence of the anti-competitive conduct alleged in this Complaint and the capacity, supply, and access of Course Materials and Inclusive Access Materials has been restricted, limited, reduced, and/or

eliminated, including the elimination of the Plaintiff Retailers and Class members who are the direct competitors of the Defendant Retailers.

224.     The Defendant Retailers have accomplished their horizontal scheme through interstate commerce.  The Defendant Retailers' anticompetitive actions were intentionally directed at the markets identified in this Complaint and had a substantial and foreseeable effect on interstate commerce.

225.     For purposes of formulating and effectuating their contract, combination, or conspiracy, the Defendant Retailers did those things they combined or conspired to do, including the Horizontal Price Fixing, the Horizontal Group Boycott, and the acts, practices, and course of conduct set forth in this Complaint.

226.     As a result of the Defendant Retailers' unlawful conduct, the Plaintiff Retailers and the Class members have been injured in their businesses and property in that they have paid more for Course Materials than they otherwise would have paid in the absence of the Defendant Retailers' unlawful conduct, have been excluded from the sale of Inclusive Access Materials, have had competition for Course Materials and Inclusive Access Materials restrained, suppressed, or eliminated, and have been deprived of the benefits of free and open competition including elimination of the secondary market for Course Materials..

227.     As a direct and proximate result of the Defendant Retailers' scheme, the Plaintiff Retailers and the Class members have been injured and financially damaged in their respective businesses and property, in amounts that are presently undetermined.  Accordingly, the Plaintiff Retailers, on behalf of themselves and the Class members, seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including attorneys' fees.

**COUNT 3:  RESTRAINT OF TRADE (15 U.S.C. § 1) – CONSPIRACY IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT AGAINST ALL DEFENDANTS**

228.    The Plaintiff Retailers incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of this Complaint.

229.    All Defendants and unnamed conspirators entered into a continuing contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) to artificially limit capacity and reduce supply, eliminate access, eliminate secondary markets and competitors in the market for Course Materials at colleges and universities, with the end goal and result of raising prices and eliminating competitors.  As set forth in the Complaint, the Defendants agreed together in violation of Section 1 to so through the Horizontal Price Fixing, the Horizontal Group Boycott, and an exclusive dealing arrangement or exclusive distributorship for the Defendant Retailers with the Publishers (the "**Exclusive Dealing**").  The Defendants entered into one or more of the following understandings or agreements:  (1) the Publishers, through a series of vertical agreements with the Defendant Retailers, created and accomplished a horizontal conspiracy of the Publishers; (2) the Defendant Retailers, through a series of vertical agreements with the Publishers, created and accomplished a horizontal conspiracy of the Defendant Retailers; or (3) vertical agreements between one or more Publishers or EPEG and one or more Defendant Retailers to restrict distribution of Inclusive Access to the Defendant Retailer(s).

230.    The Exclusive Dealing is memorialized and effectuated by, at a minimum, the So-Called License Agreements, the Exclusive Dealing Agreements, and the other understandings and agreements among the Publishers and the Defendant Retailers described in this Complaint.  As described in this Complaint, the Exclusive Dealing forecloses all or a substantial portion of the market by eliminating distribution of Inclusive Access Materials and certain other Course

Materials through any channels other than the Defendant Retailers, which previously was not the case.

231.    In engaging in the Horizontal Price Fixing, the Horizontal Group Boycott, and the Exclusive Dealing, the Defendants engaged in the same or similar conduct at or near the same time using standardized materials, contracts, and behavior, and have taken at least some actions against their independent self-interest and have had multiple opportunities to collude.

232.    The result of the Exclusive Dealing is that competitors—the Plaintiff Retailers and the Class members—have no supply to the product from any of the Defendants—the Inclusive Access Materials.  The Plaintiff Retailers have no ability to obtain Inclusive Access Materials elsewhere.

233.    The Defendants possess and exercise market power in the relevant product and geographic markets identified in this Complaint.

234.    For a horizontal conspiracy of either the Publishers or the Defendant Retailers accomplished through a series of vertical agreements, this is a *per se* violation of Section 1 of the Sherman Act.

235.    In the alternative, and also for any solely vertical agreements, the agreement between and among the Defendants caused anticompetitive effects that substantially outweigh any procompetitive justifications, if any exist, and under a rule of reason analysis, the agreements violate of Section 1 of the Sherman Act.

236.    The Defendants' anticompetitive actions have harmed competition and caused unreasonable restraints of trade.  As a result of the Defendants' unlawful conduct, the price of Course Materials and Inclusive Access Materials was raised, fixed, maintained, and stabilized in the United States at a level higher than they would have been in the absence of the anti-competitive

conduct alleged in this Complaint and the capacity, supply, and access of Course Materials and Inclusive Access Materials has been restricted, limited, reduced, and/or eliminated, including the elimination of the Plaintiff Retailers and Class members who are the direct competitors of the Defendant Retailers.

237.    The Defendants have accomplished their scheme through interstate commerce.  The Publishers produced, manufactured, and distributed and the Defendant Retailers sold Inclusive Access through the means of interstate commerce in a continuous and uninterrupted flow to customers located in states other than the states in which the Publishers market and sell such products.  The Defendants' anticompetitive actions were intentionally directed at the markets identified in this Complaint and had a substantial and foreseeable effect on interstate commerce.

238.    For purposes of formulating and effectuating their contract, combination or conspiracy, the Defendants did those things they combined or conspired to do, including the Horizontal Price Fixing, the Horizontal Group Boycott, the Exclusive Dealing, and the acts, practices, and course of conduct set forth in this Complaint.

239.    As a result of the Defendants' unlawful conduct, the Plaintiff Retailers and the Class members have been injured in their businesses and property in that they have paid more for Course Materials than they otherwise would have paid in the absence of the Publishers' and the Defendant Retailers' unlawful conduct, have been excluded from the sale of Inclusive Access Materials, have had competition for Course Materials and Inclusive Access Materials restrained, suppressed, or eliminated, and have been deprived of the benefits of free and open competition including elimination of the secondary market for Course Materials.

240.    As a direct and proximate result of the Defendants' scheme, the Plaintiff Retailers and the Class members have been injured and financially damaged in their respective businesses

and property in amounts that are presently undetermined.  Accordingly, the Plaintiff Retailers, on behalf of themselves and the Class members, seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including attorneys' fees.

### COUNT 4:  MONOPOLIZATION (15 U.S.C. § 2) – AGAINST THE PUBLISHERS AND THE DEFENDANT RETAILERS

241.    The Plaintiff Retailers incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of this Complaint.

242.    The Publishers and the Defendant Retailers have monopolized or combined or conspired to monopolize the markets described in this Complaint, including (a) the sale of Course Materials nationwide (the "**Nationwide Course Materials Market**") or (b) the sale of Inclusive Access at each specific, single University where a Defendant Retailer operates (the "**University Inclusive Access Market**").   The Nationwide Course Materials Market and the University Inclusive Access Market are valid antitrust markets.

243.    The Publishers and the Defendant Retailers possess and exercise market power in the relevant product and geographic markets identified in this Complaint.

244.    In the Nationwide Course Materials Market, the Publishers have the power to control prices and exclude competition and have done so including but not limited to with respect to the exclusion of the Independent Collegiate Retailers.  Moreover, the Publishers' contracts, combinations, and conspiracies in violation of Section 1 (described in this Complaint and set forth in Counts 1 and 3) create a market share in excess of 70%.

245.    In the University Inclusive Access Market, each Publisher and Defendant Retailer has the power to control prices and exclude competition in that market.  The Publishers are the primary providers of Inclusive Access (as described herein), and their share of the market is well in excess of 70%.  The Defendant Retailers are the only providers of Inclusive Access through the

lease-operated stores at each University at which they operate (as described in this Complaint) and thus have a market share of 100%.

246.    In the defined markets, the barriers to entry are substantial as described in this Complaint.

247.    The Publishers and the Defendant Retailers engaged in anticompetitive exclusionary conduct, as set forth in this Complaint that was intended to and had the effect of illegally acquiring, maintaining, and enhancing the monopoly of the Publishers and the Defendant Retailers in the relevant markets in violation of Section 2 of the Sherman Act.  The Publishers' and the Defendant Retailers' exclusionary acts include, *inter alia*, the exclusion of and limitation of the Plaintiff Retailers and the Class members from competing through the Exclusive Dealing, denying access to Universities, and further conduct set forth in this Complaint and Count 3.

248.    The Publishers and the Defendant Retailers have effectively excluded competition from a significant and substantial portion of the relevant markets, unlawfully acquired, maintained, and enhanced their dominant market share in the relevant markets, and profited from their anticompetitive conduct by the price of Course Materials and Inclusive Access Materials being raised, fixed, maintained, and stabilized in the United States at a level higher than they would have been in the absence of the anti-competitive conduct alleged in this Complaint and the capacity, supply, and access of Course Materials and Inclusive Access Materials being restricted, limited, reduced, and/or eliminated, including the elimination of direct competitors of the Defendant Retailers.  This conduct has no legitimate business purpose or pro-competitive effect, and even if any such purpose or effect existed, the pro-competitive effects could have been obtained by less restrictive means and/or the anticompetitive effects far outweigh the pro-competitive effects.

249.    The Publishers and the Defendant Retailers have accomplished their anticompetitive conduct through interstate commerce, and it has had a substantial effect on interstate commerce.  The Publishers' and the Defendant Retailers' anticompetitive actions were intentionally directed at the markets identified in this Complaint and had a substantial and foreseeable effect on interstate commerce.

250.    As a result of the Publishers' and the Defendant Retailers' unlawful conduct, the Plaintiff Retailers and the Class members have been injured in their businesses and property in that they have paid more for Course Materials than they otherwise would have paid in the absence of the Publishers' unlawful conduct, have been excluded from the Universities and the sale of Inclusive Access Materials, have had competition for Course Materials and Inclusive Access Materials restrained, suppressed, or eliminated, and have been deprived of the benefits of free and open competition including elimination of the secondary market for Course Materials.  This injury is of the type that the federal antitrust laws were intended to prevent and flows from that which makes the Publishers' and the Defendant Retailers' conduct unlawful.

251.    As a direct and proximate result of the Publishers' and the Defendant Retailers' anticompetitive conduct, the Plaintiff Retailers and the Class members have been injured and financially damaged in their respective businesses and property, in amounts that are presently undetermined.  Accordingly, the Plaintiff Retailers, on behalf of themselves and the Class members, seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including attorneys' fees.

## COUNT 5:  CONPSIRACY TO MONOPOLIZE (15 U.S.C. § 2) – AGAINST THE PUBLISHERS AND THE DEFENDANT RETAILERS

252.    The Plaintiff Retailers incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of this Complaint.

253.    The Publishers and the Defendant Retailers have combined or conspired to monopolize the Nationwide Course Materials Market, or the University Inclusive Access Market.

254.    The Publishers and the Defendant Retailers entered into and participated in a continuing agreement to monopolize the relevant markets through the exclusionary and anticompetitive conduct set forth in this Complaint and in Counts 3 and 4 in violation of Section 2 of the Sherman Act.  The conduct of the Publishers and the Defendant Retailers facilitated the Publishers' creation, maintenance, or enhancement of a monopoly in the Nationwide Course Materials Market and the University Inclusive Access Market and the anticompetitive effects thereof and the Defendant Retailers' creation, maintenance, or enhancement of a monopoly in the University Inclusive Access Market and the anticompetitive effects thereof (see Count 4).

255.    The Publishers and the Defendant Retailers possess and exercise market power in the relevant product and geographic markets identified in this Complaint including as described in Count 4.

256.    The Publishers and the Defendant Retailers did those things they agreed and conspired to do with the specific intent of monopolizing the relevant markets.

257.    As a result of the conspiracy, the Publishers and the Defendant Retailers have effectively excluded competition from a significant and substantial portion of the relevant markets, unlawfully acquired, maintained, and enhanced their dominant market share in the relevant markets, and profited from their anticompetitive conduct by the price of Course Materials and Inclusive Access Materials being raised, fixed, maintained, and stabilized in the United States at a level higher than they would have been in the absence of the anti-competitive conduct alleged in this Complaint and the capacity, supply, and access of Course Materials and Inclusive Access Materials being restricted, limited, reduced, and/or eliminated, including the elimination of direct

competitors of the Defendant Retailers.  This conduct has no legitimate business purpose or pro-competitive effect, and even if any such purpose or effect existed, the pro-competitive effects could have been obtained by less restrictive means and/or the anticompetitive effects far outweigh the pro-competitive effects.

258.    The Publishers and the Defendant Retailers have accomplished their horizontal anticompetitive conduct through interstate commerce, and it has had a substantial effect on interstate commerce.  The Publishers' and the Defendant Retailers' anticompetitive actions were intentionally directed at the markets identified in this Complaint and had a substantial and foreseeable effect on interstate commerce.

259.    As a result of the Publishers' and the Defendant Retailers' unlawful conduct, the Plaintiff Retailers and the Class members have been injured in their businesses and property in that they have paid more for Course Materials than they otherwise would have paid in the absence of the Publishers' unlawful conduct, have been excluded from the Universities and the sale of Inclusive Access Materials, have had competition for Course Materials and Inclusive Access Materials restrained, suppressed, or eliminated, and have been deprived of the benefits of free and open competition including elimination of the secondary market for Course Materials.  This injury is of the type that the federal antitrust laws were intended to prevent and flows from that which makes the Publishers' and the Defendant Retailers' conduct unlawful.

260.    As a direct and proximate result of the Publishers' and the Defendant Retailers' anticompetitive conduct, the Plaintiff Retailers and the Class members have been injured and financially damaged in their respective businesses and property, in amounts that are presently undetermined.    Accordingly, the Plaintiff Retailers, on behalf of themselves and the Class

members, seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including attorneys' fees.

### COUNT 6:  ATTEMPTED MONOPOLIZATION (15 U.S.C. § 2) – AGAINST THE PUBLISHERS AND THE DEFENDANT RETAILERS

261.    The Plaintiff Retailers incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of this Complaint.

262.    The Publishers and the Defendant Retailers have attempted to monopolize the markets described in this Complaint, including the Nationwide Course Materials Market or the University Inclusive Access Market.

263.    The Publishers and the Defendant Retailers possess and exercise market power in the relevant product and geographic markets identified in this Complaint including as described in Count 4.

264.    The Publishers and the Defendant Retailers attempted to monopolize the relevant markets through the exclusionary and anticompetitive conduct set forth in this Complaint and in Counts 3, 4, and 5 in violation of Section 2 of the Sherman Act. The conduct of the Publishers and the Defendant Retailers was specifically intended to facilitate the Publishers' creation, maintenance, and enhancement of a monopoly in the Nationwide Course Materials Market and the University Inclusive Access Market and the anticompetitive effects thereof and also the Defendant Retailers' creation, maintenance, and enhancement of a monopoly in the University Inclusive Access Market and the anticompetitive effects thereof (see Count 4).  This conduct has no legitimate business purpose or pro-competitive effect, and even if any such purpose or effect could exist, any possible pro-competitive effects could be obtained by less restrictive means and/or the anticompetitive effects far outweigh any possible pro-competitive effects.

265.    There is a dangerous probability that the Publishers and the Defendant Retailers would succeed in achieving monopoly power if they continue to engage in the anticompetitive conduct.  Defendants' power was and is protected by substantial barriers to effective entry and expansion set forth in this Complaint, and the market(s) are highly-exploitable for Defendants.

266.    The Publishers and the Defendant Retailers have taken actions in furtherance of this attempt through interstate commerce, and these actions were intentionally directed at the markets identified in this Complaint with a substantial and foreseeable effect on interstate commerce.

267.    As a result of the Publishers' and the Defendant Retailers' unlawful conduct, the Plaintiff Retailers and the Class members have been injured in their businesses and property in that they have paid more for Course Materials than they otherwise would have paid in the absence of the Publishers' unlawful conduct, have been excluded from the Universities and the sale of Inclusive Access Materials, have had competition for Course Materials and Inclusive Access Materials restrained, suppressed, or eliminated, and have been deprived of the benefits of free and open competition including elimination of the secondary market for Course Materials.  This injury is of the type that the federal antitrust laws were intended to prevent and flows from that which makes the Publishers' and the Defendant Retailers' conduct unlawful.

268.    As a direct and proximate result of the Publishers' and the Defendant Retailers' anticompetitive conduct, the Plaintiff Retailers and the Class members have been injured and financially damaged in their respective businesses and property, in amounts that are presently undetermined.  Accordingly, the Plaintiff Retailers, on behalf of themselves and the Class members, seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including attorneys' fees.

## COUNT 7:  PRICE DISCRIMINATION (15 U.S.C. § 13(a)) – AGAINST THE PUBLISHERS

269.    The Plaintiff Retailers incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of this Complaint.

270.    The Publishers were, and continue to be, persons engaged in interstate commerce, as defined by the Robinson-Patman Act.

271.    The Publishers have manufactured and sold commodity Course Materials in interstate commerce to numerous Defendant Retailers at the Universities, who are in direct competition with the Plaintiff Retailers, for resale to students of the Universities.

272.    The Plaintiff Retailers have purchased commodity Course Materials from the Publishers in interstate commerce for resale to students of the Universities.

273.    The Publishers, in the course of commerce, knowingly sold, and are continuing to sell, the same Course Materials to the Defendant Retailers at discriminatory prices in violation of Section 13(a) of the Robinson-Patman Act, which prices were, and remain, substantially less than the Publishers charged, and presently charge, the Plaintiff Retailers for the identical and contemporaneously-purchased Course Materials of like grade and quality, including as set forth in this Complaint.  There was a reasonable probability that this discriminatory pricing may harm competition and in fact it has and will continue to harm competition.

274.    The Publishers' discriminatory pricing and related illegal discriminatory and anticompetitive practices were not, and are not, justified based upon any differences in the cost of manufacture, sale of delivery resulting from any differing methods or quantities in which the Course Materials were, or are, sold or delivered to the Plaintiff Retailers, as compared to the Defendant Retailers or upon changing conditions affecting the market for, or the marketability of, the Course Materials.

275.     As a direct and proximate result of the illegal discriminatory and anticompetitive practices being engaged in by the Publishers, the Plaintiff Retailers' ability to compete with the Defendant Retailers for sales of Course Materials for which there was discriminatory pricing has been substantially diminished or eliminated.

276.     This price discrimination has caused economic injury to the Plaintiff Retailers, including but not limited to damage to their business, reputation, customer goodwill, lost sales, and lost profits, and has caused and will continue to cause substantial injury to competition generally.   Accordingly, the Plaintiff Retailers seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including attorneys' fees.

### COUNT 8:  PRICE DISCRIMINATION (15 U.S.C. § 13(f)) – AGAINST THE DEFENDANT RETAILERS

277.     The Plaintiff Retailers incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of this Complaint.

278.     The Defendant Retailers in the course of interstate commerce knowingly induced and continue to induce and/or knowingly received and continue to receive discriminatory pricing of Course Materials by and/or from the Publishers as set forth in Count 7, in violation of Section 13(f) of the Robinson Patman Act.

279.     The effect of the Defendant Retailers' illegal and anticompetitive actions and unfair business conduct has been that the Defendant Retailers received substantially lower prices than the Plaintiff Retailers on contemporaneous sales of commodities of like grade and quality to be sold to students in direct competition with the Plaintiff Retailers.

280.     This price discrimination has caused economic injury to the Plaintiff Retailers, including but not limited to damage to their business, reputation, customer goodwill, lost sales, and lost profits, and has caused and will continue to cause substantial injury to competition

generally.  Accordingly, the Plaintiff Retailers seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including attorneys' fees.

### COUNT 9:  INJUNCTIVE RELIEF (15 U.S.C. § 26) – AGAINST ALL DEFENDANTS PURSUANT TO SECTION 16 OF THE CLAYTON ACT

281.    The Plaintiff Retailers incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of this Complaint.

282.    Pursuant to Section 16 of the Clayton Act, the Plaintiff Retailers and the Class members seek the issuance of an injunction against Defendants preventing and restraining the antitrust violations alleged herein.

283.    The Plaintiff Retailers and the Class members qualify as "persons" under Section 1 of the Clayton Act.

284.    The Plaintiff Retailers and the Class members are entitled to an injunctive remedy based upon the above Counts 1-8 under the Sherman Act, the Clayton Act, and the Robinson-Patman Act due to the loss and future injury caused by Defendants' antitrust violations.

285.    The Plaintiff Retailers and the Class members request an injunctive remedy that is as broad as necessary to terminate illegal conduct, prevent or eliminate its consequences, and ensure that violations do not recur.

### COUNT 10:  CLAIMS UNDER ARKANSAS LAW (VIOLATIONS OF ARK. CODE ANN. §§ 4-75-201, *et seq.* and UNJUST ENRICHMENT)

286.    The Plaintiff Retailers incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of this Complaint.

### A.      The Arkansas Unfair Practices Act (Against the Publishers and Defendant Retailers)

287.    The Publishers and Defendant Retailers agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively restraining competition in the marketplace of

Course Materials in Arkansas, constituting an unfair method of competition and/or unfair deceptive acts or practices within the meaning of the Arkansas Unfair Practices Act (the "**AUPA**").

288.    By reason of the foregoing, the Publishers and Defendant Retailers have acted in violation of the AUPA, Arkansas Code Annotated §§ 4-75-201, *et seq.*

289.    The Publishers and Defendant Retailers are corporations and thus are "person[s]" for purposes of the Act.

290.    During the Class period, the Publishers' and Defendant Retailers' manufacture, distribution, and sale of Course Materials and Inclusive Access in Arkansas constitutes "economic activity" within the meaning of the AUPA.

291.    The Horizontal Price Fixing, Horizontal Group Boycott, the Trade Association Violations, the Exclusive Dealing, and the monopolization and price discrimination set forth in this Complaint and alleged in Counts 1-8 have substantially affected trade and commerce throughout Arkansas.  The acts and practices engaged in by the Publishers and Defendant Retailers and described herein constitute unfair and discriminatory practices by which fair and honest competition is destroyed or prevented in violation of the AUPA.

292.    In addition, the Publishers and the Defendant Retailers charge students for access to their financial aid funds, in violation of Department of Education ("**DOE**") regulations, including 34 C.F.R. 668.164(c)(2), because Inclusive Access is not offered at "lower than the competitive market rate" and students are not provided with an "opt out."  Under 34 C.F.R. 668.164(c)(2), entities are only permitted to credit a student's ledger account with Title IV funds to pay for books and supplies as a part of tuition charges without the student's or parent's authorization if:  (1) the books are offered at costs that are lower than the competitive market rate, and (2) policy allows a student or parent to decline or opt out of using the school provided means

to obtain the books.  The public policy of the United States makes clear that students are to have a clear and fair choice on how to receive their financial aid funds.  The Publishers and the Defendant Retailers violate this regulation and act contrary to the public policy of the United States because they do not offer Inclusive Access at lower than competitive market rates and do not provide students with an opt out of Inclusive Access in violation of Section 668.  The Publishers and the Defendant Retailers act contrary to the public policy of the United States because they unfairly, deceptively, or improperly obtain Title IV funds to pay for books in violation of the DOE regulations (the "**DOE Violations**").

293.    As a direct and proximate result of the Publishers' and Defendant Retailers' unlawful and anticompetitive practices, including the employment of these unfair and deceptive acts and practices, the Plaintiff Retailers and the Class members have been injured in their business and/or property.  The Plaintiff Retailers and the Class members have suffered an ascertainable loss and have been damaged by Publishers' and Defendant Retailers' unlawful acts.  The Plaintiff Retailers and the Class members are thus entitled to all relief available under the AUPA.

**B.**    **Unjust Enrichment (Against the Publishers and Defendant Retailers)**

294.    By engaging in the wrongful conduct described herein, the Publishers and Defendant Retailers received higher prices for Course Materials and Inclusive Access Materials that were sold in Arkansas than would have been possible absent the illegal conduct.  In so doing, the Publishers and Defendant Retailers acted with conscious disregard for the rights of the Plaintiff Retailers and the Class members.

295.    As a result of the Publishers' and Defendant Retailers' wrongful conduct as alleged herein, the Publishers and Defendant Retailers have been unjustly enriched at the expense of, and to the detriment of, the Plaintiff Retailers and the Class members.

296.     The Publishers' and Defendant Retailers' unjust enrichment is traceable to, and resulted directly and proximately from, the wrongful conduct alleged herein.

297.     The enrichment of the Publishers and Defendant Retailers that occurred because of their illegal activities was without legally cognizable justification.   Under the common law doctrine of unjust enrichment, it is inequitable for the Publishers and Defendant Retailers to be permitted to retain the benefits they received, and to the extent legal remedies do not sufficiently accomplish disgorgement of the Publishers' and Defendant Retailers' illegal profits from their sales in Arkansas, the Publishers and Defendant Retailers should be ordered to make restitution.

## COUNT 11:  CLAIMS UNDER KENTUCKY LAW
### (VIOLATIONS OF KY. REV. STAT. ANN. §§ 365.020, *et seq.* and UNJUST ENRICHMENT)

298.     The Plaintiff Retailers incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of this Complaint.

**A.     The Kentucky Unfair Trade Practices Act (Against the Publishers and Defendant Retailers)**

299.     The Publishers and Defendant Retailers agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively restraining competition in the marketplace of Course Materials in Kentucky, constituting an unfair method of competition and/or unfair deceptive acts or practices within the meaning of the Kentucky Unfair Trade Practices Act (the "**KUTPA**").

300.     By reason of the foregoing, the Publishers and Defendant Retailers have acted in violation of the KUTPA, Ky. Rev. Stat. Ann. §§ 365.020, *et seq.*

301.     The Publishers and Defendant Retailers are corporations and thus are "person[s]" for purposes of the KUTPA.

302.    During the Class period, the Publishers' and Defendant Retailers' manufacture, distribution, and sale of Course Materials and Inclusive Access in Kentucky constitutes a trade practice within the meaning of the Act.

303.    The Horizontal Price Fixing, Horizontal Group Boycott, the Trade Association Violations, the Exclusive Dealing, and the monopolization and price discrimination set forth in this Complaint and alleged in Counts 1-8, as well as the DOE Violations alleged herein, have substantially affected trade and commerce throughout Kentucky.  The acts and practices engaged in by the Publishers and Defendant Retailers and described herein constitute unfair and discriminatory practices by which fair and honest competition is destroyed or prevented in violation of the KUTPA.

304.    As a direct and proximate result of the Publishers' and Defendant Retailers' unlawful and anticompetitive practices, including the employment of these unfair and deceptive acts and practices, the Plaintiff Retailers and the Class members have been injured in their business and/or property.  The Plaintiff Retailers and the Class members have suffered an ascertainable loss and have been damaged by Publishers' and Defendant Retailers' unlawful acts.  The Plaintiff Retailers and the Class members are thus entitled to all relief available under the KUTPA.

**B.    Unjust Enrichment (Against the Publishers and Defendant Retailers)**

305.    By engaging in the wrongful conduct described herein, the Publishers and Defendant Retailers received higher prices for Course Materials and Inclusive Access that were sold in Kentucky than would have been possible absent the illegal conduct.  In so doing, the Publishers and Defendant Retailers acted with conscious disregard for the rights of the Plaintiff Retailers and the Class members.

306.    As a result of the Publishers' and Defendant Retailers' wrongful conduct as alleged herein, the Publishers and Defendant Retailers have been unjustly enriched at the expense of, and to the detriment of, the Plaintiff Retailers and the Class members.

307.    The Publishers' and Defendant Retailers' unjust enrichment is traceable to, and resulted directly and proximately from, the wrongful conduct alleged herein.

308.    The enrichment of the Publishers and Defendant Retailers that occurred because of their illegal activities was without legally cognizable justification.   Under the common law doctrine of unjust enrichment, it is inequitable for the Publishers and Defendant Retailers to be permitted to retain the benefits they received, and to the extent legal remedies do not sufficiently accomplish disgorgement of the Publishers' and Defendant Retailers' illegal profits from their sales in Kentucky, the Publishers and Defendant Retailers should be ordered to make restitution.

### COUNT 12:  CLAIMS UNDER NEW MEXICO LAW
### (VIOLATIONS OF N.M.S.A. 1978 §§ 57-1-1, *et seq.*, §§ 57-12-1, *et seq.*, and §§ 57-14-1, *et seq.* and UNJUST ENRICHMENT)

309.    The Plaintiff Retailers incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of this Complaint.

**A.    The New Mexico Antitrust Act (Against the Publishers and Defendant Retailers)**

310.    The Publishers and Defendant Retailers agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively restraining competition in the marketplace of Course Materials in New Mexico, constituting an unfair method of competition and/or unfair deceptive acts or practices within the meaning of the New Mexico Antitrust Act (the "**NM Antitrust Act**").

311.    By reason of the foregoing, the Publishers and Defendant Retailers have acted in violation of the NM Antitrust Act, N.M.S.A. 1978 §§ 57-1-1, *et seq.*.

312.    Publishers and Defendant Retailers are corporations and thus are "person[s]" for purposes of the NM Antitrust Act.

313.    During the Class period, the Publishers' and Defendant Retailers' manufacture, distribution, and sale of Inclusive Access in New Mexico constitutes "commerce" within the meaning of the NM Antitrust Act.

314.    The Horizontal Price Fixing, Horizontal Group Boycott, the Trade Association Violations, the Exclusive Dealing, and the monopolization and price discrimination set forth in this Complaint and alleged in Counts 1-8, as well as the DOE Violations alleged herein, have substantially affected trade and commerce throughout New Mexico.  All of the acts and practices engaged in by the Publishers and Defendant Retailers and described herein, constitute unfair and discriminatory practices by which fair and honest competition is destroyed or prevented in violation of the NM Antitrust Act.

315.    As a direct and proximate result of the Publishers' and Defendant Retailers' unlawful and anticompetitive practices, including the employment of these unfair and deceptive acts and practices, the Plaintiff Retailers and the Class members have been injured in their business and/or property.  The Plaintiff Retailers and the Class members have suffered an ascertainable loss and have been damaged by the Publishers' and Defendant Retailers' unlawful acts.  The Plaintiff Retailers and the Class members are thus entitled to all relief available under the NM Antitrust Act.

**B.    The New Mexico Unfair Practices Act (Against the Publishers)**

316.    The Publishers agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively restraining competition in the marketplace of Course Materials in New

Mexico, constituting an unfair method of competition and/or unfair deceptive acts or practices within the meaning of the New Mexico Unfair Practices Act (the "**NMUPA**").

317.    By reason of the foregoing, the Publishers have acted in violation of the NMUPA, §§ 57-12-1, *et seq.*

318.    The Publishers are corporations and thus are "person[s]" for purposes of the NMUPA.

319.    During the Class period, the Publishers' manufacture, distribution, and sale of Inclusive Access in New Mexico constitutes "commerce" within the meaning of NMUPA.

320.    The Horizontal Price Fixing, Horizontal Group Boycott, the Trade Association Violations, the Exclusive Dealing, and the monopolization and price discrimination set forth in this Complaint and alleged in Counts 1-8, as well as the DOE Violations alleged herein, have substantially affected trade and commerce throughout New Mexico.  All of the acts and practices engaged in by the Publishers and described herein, constitute unfair and discriminatory practices by which fair and honest competition is destroyed or prevented in violation of the NMUPA.

321.    As a direct and proximate result of the Publishers' unlawful and anticompetitive practices, including the employment of these unfair and deceptive acts and practices, the Plaintiff Retailers and the Class members have been injured in their business and/or property.  The Plaintiff Retailers and the Class members have suffered an ascertainable loss and have been damaged by the Publishers unlawful acts.  The Plaintiff Retailers and the Class members are thus entitled to all relief available under the NMUPA.

**C.    The New Mexico Price Discrimination Act (Against the Publishers and Defendant Retailers)**

322.    The Publishers and Defendant Retailers agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively restraining competition in the marketplace of

Course Materials in New Mexico, constituting an unfair method of competition and/or unfair deceptive acts or practices within the meaning of the New Mexico Price Discrimination Act (the "**NMPDA**").

323.    By reason of the foregoing, the Publishers and Defendant Retailers have acted in violation of the NMPDA §§ 57-14-1, *et seq.*

324.    The Publishers and Defendant Retailers are corporations and thus are "person[s]" for purposes of the NMPDA.

325.    During the Class period, the Publishers' and Defendant Retailers' manufacture, distribution, and sale of Inclusive Access in New Mexico constitutes "commerce" within the meaning of the NMPDA.

326.    The price discrimination practices set forth in this Complaint and alleged in Counts 7 and 8 has substantially affected trade and commerce throughout New Mexico and violate the NMPDA.

327.    As a direct and proximate result of the Publishers' and Defendant Retailers' price discrimination practices, the Plaintiff Retailers and the Class members have been injured in their business and/or property.  The Plaintiff Retailers and the Class members have suffered an ascertainable loss and have been damaged by the Publishers' and Defendant Retailers' unlawful acts.  The Plaintiff Retailers and the Class members are thus entitled to all relief available under the NMPDA.

**D.**    **Unjust Enrichment (Against the Publishers and Defendant Retailers)**

328.    By engaging in the wrongful conduct described herein, the Publishers and Defendant Retailers received higher prices for Course Materials and Inclusive Access that were sold in New Mexico than would have been possible absent the illegal conduct.  In so doing, the

Publishers and Defendant Retailers acted with conscious disregard for the rights of the Plaintiff Retailers and the Class members.

329.    As a result of the Publishers' and Defendant Retailers' wrongful conduct as alleged herein, the Publishers and Defendant Retailers have been unjustly enriched at the expense of, and to the detriment of, the Plaintiff Retailers and the Class members.

330.    The Publishers' and Defendant Retailers' unjust enrichment is traceable to, and resulted directly and proximately from, the wrongful conduct alleged herein.

331.    The enrichment of the Publishers and Defendant Retailers that occurred because of their illegal activities was without legally cognizable justification.   Under the common law doctrine of unjust enrichment, it is inequitable for the Publishers and Defendant Retailers to be permitted to retain the benefits they received, and to the extent legal remedies do not sufficiently accomplish disgorgement of the Publishers' and Defendant Retailers' illegal profits from their sales in New Mexico, the Publishers and Defendant Retailers should be ordered to make restitution.

## COUNT 13:  CLAIMS UNDER TENNESSEE LAW (UNJUST ENRICHMENT AGAINST PUBLISHERS AND DEFENDANT RETAILERS)

332.    The Plaintiff Retailers incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of this Complaint.

333.    By engaging in the wrongful conduct described herein, the Publishers and Defendant Retailers received higher prices for Course Materials and Inclusive Access that were sold in Tennessee than would have been possible absent the illegal conduct.  In so doing, the Publishers and Defendant Retailers acted with conscious disregard for the rights of the Plaintiff Retailers and the Class members.

334.     As a result of the Publishers' and Defendant Retailers' wrongful conduct as alleged herein, the Publishers and Defendant Retailers have been unjustly enriched at the expense of, and to the detriment of, the Plaintiff Retailers and the Class members.

335.     The Publishers' and Defendant Retailers' unjust enrichment is traceable to, and resulted directly and proximately from, the wrongful conduct alleged herein.

336.     The enrichment of the Publishers and Defendant Retailers that occurred because of their illegal activities was without legally cognizable justification.   Under the common law doctrine of unjust enrichment, it is inequitable for the Publishers and Defendant Retailers to be permitted to retain the benefits they received, and to the extent legal remedies do not sufficiently accomplish disgorgement of the Publishers' and Defendant Retailers' illegal profits from their sales in Tennessee, the Publishers and Defendant Retailers should be ordered to make restitution.

**COUNT 14:  CLAIMS UNDER TEXAS LAW (VIOLATIONS OF TEX. BUS. & COM. CODE §§ 15.01, *et seq.* and UNJUST ENRICHMENT)**

337.     The Plaintiff Retailers incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of this Complaint.

**A.     The Texas Free Enterprise and Antitrust Act of 1983 (Against the Publishers and Defendant Retailers)**

338.     The Publishers and Defendant Retailers agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively restraining competition in the marketplace of Course Materials in Texas, constituting an unfair method of competition and/or unfair deceptive acts or practices within the meaning of the Texas Free Enterprise and Antitrust Act of 1983 (the "**TX Antitrust Act**").

339.     By reason of the foregoing, the Publishers and Defendant Retailers have acted in violation of the TX Antitrust Act, Tex. Bus. & Com. Code §§ 15.01, *et seq.*

340.    The Publishers and Defendant Retailers are corporations and thus are "person[s]" for purposes of the TX Antitrust Act.

341.    During the Class period, the Publishers' and Defendant Retailers' manufacture, distribution, and sale of Inclusive Access in Texas constitutes "trade" and "commerce" within the meaning of the TX Antitrust Act.

342.    The Horizontal Price Fixing, Horizontal Group Boycott, the Trade Association Violations, the Exclusive Dealing, and the monopolization and price discrimination set forth in this Complaint and alleged in Counts 1-8, as well as the DOE Violations alleged herein, have substantially affected trade and commerce throughout Texas.  The acts and practices engaged in by the Publishers and Defendant Retailers and described herein constitute unfair and discriminatory practices by which fair and honest competition is destroyed or prevented in violation of the Act.

343.    As a direct and proximate result of the Publishers' and Defendant Retailers' unlawful and anticompetitive practices, including the employment of these unfair and deceptive acts and practices, the Plaintiff Retailers and the Class members have been injured in their business and/or property.  The Plaintiff Retailers and the Class members have suffered an ascertainable loss and have been damaged by the Publishers' and Defendant Retailers' unlawful acts.  The Plaintiff Retailers and the Class members are thus entitled to all relief available under the TX Antitrust Act.

**B.    Unjust Enrichment (Against the Publishers and Defendant Retailers)**

344.    By engaging in the wrongful conduct described herein, the Publishers and Defendant Retailers received higher prices for Course Materials and Inclusive Access that was sold in Texas than would have been possible absent the illegal conduct.  In so doing, the Publishers

and Defendant Retailers acted with conscious disregard for the rights of the Plaintiff Retailers and the Class members.

345.    As a result of the Publishers' and Defendant Retailers' wrongful conduct as alleged herein, the Publishers and Defendant Retailers have been unjustly enriched at the expense of, and to the detriment of, the Plaintiff Retailers and the Class members.

346.    The Publishers' and Defendant Retailers' unjust enrichment is traceable to, and resulted directly and proximately from, the wrongful conduct alleged herein.

347.    The enrichment of the Publishers and Defendant Retailers that occurred because of the Publishers' and Defendant Retailers' illegal activities was without legally cognizable justification.  Under the common law doctrine of unjust enrichment, it is inequitable for the Publishers and Defendant Retailers to be permitted to retain the benefits they received, and to the extent legal remedies do not sufficiently accomplish disgorgement of the Publishers' and Defendant Retailers' illegal profits from their sales in Texas, the Publishers and Defendant Retailers should be ordered to make restitution.

## VIII.   JURY DEMAND

348.    The Plaintiff Retailers demand a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, on all issues triable as of right by jury.

## IX.    PUNITIVE AND TREBLE DAMAGES

349.    All of the acts committed by the Defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, and/or recklessly, and said acts meet the standards required for the imposition of punitive damages.

350.    The Plaintiff Retailers are entitled to recover treble damages under Section 4c of the Clayton Act (15 U.S.C. § 15(a)) and applicable state laws.

## X.   ATTORNEYS' FEES

351.   The Plaintiff Retailers are entitled to recover their reasonable and necessary attorneys' fees and costs for their claims against the Defendants.

## XI.   CONCLUSION AND PRAYER FOR RELIEF

352.   The Plaintiff Retailers request that the Court:

a.   Determine that the claims herein under the Sherman Act, the Robinson-Patman Act, the Clayton Act, the state antitrust laws, and the state consumer protection and/or unfair competition laws may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure;

b.   Adjudge and decree that the unlawful conduct alleged herein constitutes:

   i.   A violation of the Sherman Act, 15 U.S.C. § 1, as alleged in Counts 1, 2, and 3;

   ii.   A violation of the Sherman Act, 15 U.S.C. § 2, as alleged in Count 4, 5, and 6;

   iii.   A violation of the Robinson-Patman Act (15 U.S.C. §§ 13(a) and 13(f)), as alleged in Counts 7 and 8; and

   iv.   A violation of the state antitrust, consumer protection and unfair competition laws as alleged in Counts 10 – 14.

c.   Adjudge preliminary and permanent injunctive relief under the Clayton Act (15 U.S.C. § 26) requiring the Defendants to cease and desist from restraining competition in the marketplace of college Course Materials and Inclusive Access Materials as alleged in Count 9;

d.   Adjudge compensatory damages;

e.   Award treble damages and punitive damages for injury including under Section
     4 of the Clayton Act and applicable state laws;

f.   Award costs and attorneys' fees;

g.   Award pre-judgment interest and post-judgment interest to the full extent
     allowed under the law; and

h.   Award such other and further relief against Defendants as may be necessary
     and appropriate.

DATED:  January 22, 2020

Respectfully submitted,

By:     */s/ John C. Phillips, Jr.*
            John C. Phillips, Jr. (#110)
            David A. Bilson (#4986)
            **PHILLIPS, GOLDMAN,**
            **MCLAUGHLIN & HALL P.A.**
            1200 North Broom Street
            Wilmington, Delaware 19806
            Telephone:  302/655-4200
            Facsimile:  302/655-4210
            jcp@pgmhlaw.com
            dab@pgmhlaw.com

            *Of Counsel:*

            Nicole Williams
            Mackenzie S. Wallace
            **THOMPSON & KNIGHT LLP**
            1722 Routh Street, Suite 1500
            Dallas, Texas 75201
            Telephone:  214/969-1700
            Facsimile:  214/969-1751
            Nicole.Williams@tklaw.com
            Mackenzie.Wallace@tklaw.com

            Stuart Cochran
            L. Kirstine Rogers
            **STECKLER GRESHAM**
            **COCHRAN PLLC**
            12720 Hillcrest Road, Suite 1045
            Dallas, Texas 75230
            Telephone:  972/387.4040
            Facsimile:  972/387.4041
            stuart@sgc.law
            krogers@sgc.law

            *Attorneys for Plaintiff Retailers*